## *In re* FERNANDO GALLARDO DÍAZ, Juez del Tribunal Superior de Puerto Rico, querellado.

Número 3.

*Sometido:* 18 de abril de 1958.  *Resuelto:* 13 de noviembre de 1958.

*Hon. Secretario de Justicia J. B. Fernández Badillo y José C. Aponte y Guillermo A. Gil, Fiscales Especiales Generales,* abogados del querellante; *Benjamín Ortiz y Yamil Galib,* abogados del querellado.

### RESOLUCIÓN

San Juan, Puerto Rico, a 13 de noviembre de 1958.

La vista de este caso se celebró durante los días 19 a 25 de marzo de 1958, sin la participación de los Jueces Asociados Sres. Pérez Pimentel y Saldaña, quienes se habían inhibido de entender en el mismo.

Habiendo anunciado el Juez Asociado Sr. Belaval en el día de hoy su determinación de no participar en la resolución final de este asunto, el Tribunal se encuentra igualmente dividido en cuanto a si los cargos formulados en la querella han quedado probados, siendo irreconciliables los criterios sustentados en sentido afirmativo por el Juez Presidente Sr. Negrón Fernández y el Juez Asociado Sr. Serrano Geyls

y en sentido negativo por los Jueces Asociados Sres. Hernández Matos y Santana Becerra.

No pudiendo el Tribunal llegar a un acuerdo de mayoría para la disposición final del caso, se ordena el archivo de la querella formulada contra el Juez Superior Sr. Fernando Gallardo Díaz y se le reinstala en su cargo de Juez, con efecto inmediato, ordenándose asimismo el pago a su favor de los haberes correspondientes al período de su suspensión de empleo y sueldo.

Las opiniones representativas de los distintos criterios en el caso serán emitidas próximamente.

Lo acordó el Tribunal y firma el Sr. Juez Presidente. Los Jueces Asociados Sres. Pérez Pimentel, Belaval y Saldaña no intervinieron.

#### CONCLUSIONES DEL TRIBUNAL SOBRE LOS HECHOS EXPUESTOS POR EL JUEZ ASOCIADO SR. HERNÁNDEZ MATOS

### San Juan, Puerto Rico, a 12 de marzo de 1959

El 7 de mayo de 1957 el letrado César Andréu Ribas presentó una queja, bajo juramento, ante el Director Administrativo de la Oficina de Administración de los Tribunales, formulando cargos contra el Juez Superior, Fernando Gallardo Díaz, con motivo de hechos ocurridos en la mañana del día 3 del mismo mes durante el incidente sobre aprobación de una transcripción de las notas taquigráficas tomadas en cierta causa criminal, que se ventilaba ante la Sala de Bayamón del Tribunal Superior, presidida por dicho Juez. [1]

---

[1] Su texto es el siguiente:

"El pasado viernes le visité para informarle personalmente del atropello de que fui víctima la mañana de ese día, por parte del Juez Superior, Lcdo. Fernando Gallardo Díaz, en la Sala de Bayamón, en plena sesión de la corte, en presencia de un nutrido público integrado por damas y caballeros, abogados de ambos sexos, y otros funcionarios del tribunal y miembros de la Policía Estatal. La gravedad de lo ocurrido, sin precedentes por partir del magistrado un desafío violento a un abogado postulante, —lo que constituye una flagrante violación del estatuto penal que dicho magistrado es el primero que viene obligado a acatar y a hacer cumplir, —así como el conocimiento que tengo por

Informado de ello el Juez Presidente, este Tribunal Supremo por resolución del 9 de mayo de 1957, ordenó "una investigación total y completa de todos los hechos, circunstancias e incidentes derivados de la radicación y vista de una 'Solicitud de Enmiendas a la Transcripción de Evidencia' en el caso criminal número C–56–198 del Tribunal Superior de Puerto Rico, Sala de Bayamón," y a la vez

information que tengo de otros hechos análogos realizados por el Juez Fernando Gallardo Díaz con otros abogados, fiscales, testigos y litigantes, me colocan en la triste y desagradable alternativa, que por largos años he venido evadiendo, de formular la siguiente querella que deseo hacer llegar al Honorable Tribunal Supremo de Puerto Rico por vuestro conducto, tal y como lo dispone el texto de la Sección 24 de la Ley de la Judicatura, con miras y súplica de que se investiguen los hechos por mí denunciados y se apliquen al querellado aquellas sanciones que a juicio del Honorable Tribunal Supremo merezca su comportamiento.

"A fines del año pasado fui contratado por el Sr. Miguel Ángel Marín Canals, químico, para representarlo en dos causas criminales (G-56–198 y M-56–251) por infracciones a la Ley de Armas.

"En el acto de la lectura de las acusaciones, el abogado que representó al acusado, designado por el propio Juez Gallardo, lo fue el compañero, José R. Fournier, quien hizo alegación de inocencia y solicitó juicio por jurado, comunicando al tribunal que el suscribiente asistiría al acusado en el juicio. No obstante existir antecedentes de enemistad entre el magistrado y el defensor infrascrito, (antecedentes que dieron lugar a que se radicaran mociones de inhibición en otros casos atendidos por mí) el Juez Gallardo presidió la vista de los juicios contra Marín Canals celebrándose éstos conjuntamente los días 24 y 25 del pasado mes de enero. Aunque creíamos que ambos casos, el delito menos grave y el *felony*, habrían de verse ante el jurado (así fue solicitado, a tenor de lo que dispone el Artículo 178 de Enjuiciamiento Criminal) para sorpresa nuestra el día del juicio fue sometido uno, el grave, al jurado, y el misdemeanor, lo resolvió el Juez Gallardo. En el momento en que el Fiscal Grajales terminó su prueba, renunciando al único testigo que no era un policía, el señor magistrado ordenó retirar al jurado y dirigiéndose al Fiscal Grajales, le increpó, criticándole por su desidia en la investigación de los hechos, llamándole deficiente por no haberse trasladado a Cataño y no haber 'amarrado' a todos los posibles testigos presenciales de manera que la defensa no los hubiera podido producir en corte el día del juicio a controvertir los hechos y versión que de ellos trajera el Ministerio Público. A pesar de esas manifestaciones, y de que el jurado en menos de media hora, llegaba a veredicto absolutorio para el acusado luego de oír el testimonio de cinco ciudadanos, el Juez Gallardo lo declaró culpable del delito de poseer un arma sin licencia para tenerla y poseerla imponiéndole seis meses de cárcel para luego de así hacerlo, pedirle al Fiscal un llamado 'récord penal' (que no

·solicitó del Secretario de Justicia que practicara dicha investigación y rindiera informe para la ulterior consideración que procediera.

Practicada la investigación así ordenada, rendido el informe correspondiente por el Secretario de Justicia y luego

---

fue presentado en evidencia, ni era, por tanto, prueba del caso, ni pudo ser examinado y mucho menos controvertido por el acusado) para terminar diciendo: 'Creo que está justificada la convicción de ahora . . . .' De dicha sentencia apeló el acusado inmediatamente, solicitando la transcripción de la evidencia, lo que se hizo por el Sr. Juan Amaral, taquígrafo de récord, por orden del tribunal.

"Que leída dicha transcripción, y habiendo encontrado que en la misma se habían omitido las frases del incidente entre el Juez Gallardo y el Fiscal Grajales, las cuales eran de sustancial importancia para nuestro recurso de apelación ya que demostraban el estado de duda mental en que quedó el magistrado luego de oír la prueba de cargo, radicamos una moción proponiendo enmiendas a dicha transcripción, con fecha 21 de marzo de 1957, acompañada de una solicitud de suspensión de la vista ya señalada para la aprobación de la transcripción en 5 de abril en razón a que habríamos de estar ausentes de Puerto Rico por dos semanas. Que en nuestra moción de suspensión nos dirigimos 'A la Honorable Corte' y en el escrito proponiendo enmiendas repetimos las frases que tomamos en el juicio a manuscrito cuando ocurrió dicho incidente; que con fecha 27 de marzo recibimos una carta del Sr. Juan Amaral, (copia fotostática de la cual acompañamos) con varios pliegos adicionales "que deben intercalarse en la transcripción" y que, aunque no contiene todo lo dicho por el Juez Gallardo al Fiscal Grajales (véase cuantos puntos suspensivos hay tanto al comienzo de algunas como al terminar otras, indicativos de que se escapó al taquígrafo algo de lo que fuera dicho) refleja en líneas generales lo ocurrido y lo expresado por el magistrado en cuanto a la prueba del Pueblo.

"En esas condiciones, comparecimos al tribunal el viernes pasado, conformes en no insistir en otras enmiendas y aceptar la versión de las notas adicionalmente servidas por el señor Amaral, y con ánimo de darle a éste la satisfacción de oír de mi propia boca el reconocimiento a su competencia, rectitud profesional y de servidor público. Ya habíamos cumplido ese deber de caballerosidad con el señor Amaral cuando nos disponíamos a dejar la sala presidida por el Juez Gallardo, sin que el Fiscal Grajales hubiere hecho oposición alguna a nuestras enmiendas, es decir, a las que hiciera el señor Amaral, ya que dejamos las nuestras sin insistir en ellas para evitar rozamientos con el Juez Gallardo que ya había dicho que la frase 'amarrados' no la había usado él 'porque yo no soy ningún vaquero', cuando dirigiéndose a mí, en forma airada, violenta, en alta voz, desorbitado, me dijo: 'Oiga, venga acá. Yo no había leído esto, ahora lo veo por primera vez. Aquí al final de su moción usted me llama Juez Fernando Gallardo y no me dice honorable, a mí no me importa si usted me cree á mí honorable o no. Yo soy

de ser examinado el expediente completo de esa investigación, este Tribunal, por resolución dictada el 7 de febrero de 1958, determinó que existía causa para ulteriores procedimientos contra el Juez Superior Fernando Gallardo Díaz,

---

honorable aquí y dondequiera, muy honorable.' Ante esa inesperada y anormal actitud, serenamente contesté: 'Bendito sea Dios, señor Juez, yo no he venido aquí para que usted me mortifique ni mucho menos para que usted me maltrate. Usted no debe tratarme así porque usted es el juez y yo le debo respeto. . . . '

"En ese momento, el Juez Gallardo se puso de pie, dio un manotazo sobre la mesa, y echándose hacia adelante como si quisiera alcanzarme desde estrados, me dijo: 'Lo que le digo aquí, se lo digo afuera y si quiere verlo, sálgase.' Con lo cual, se lanzó por el lado a toda prisa, con la mano derecha agarrándose la cintura, a la vez que decía: 'Déjenme, suéltenme, usted no es más que un pendejo', teniendo que ser agarrado por el Márshal, el Márshal Auxiliar, su Secretaria y el Lcdo. José R. Fournier, mientras yo le contestaba: 'Más pendejo es usted', sin que nadie tuviera que sujetarme ya que me limitaba a esperar ser agredido y a responder los insultos, sin asumir actitud ofensiva alguna. Que el escándalo que se formó hizo que gritaran mujeres y niños allí presentes en la Sala del tribunal, y que tanto los demás funcionarios del tribunal, muy especialmente el Fiscal Grajales y los marshals en todo momento me protegieron del Juez Gallardo invitándome el primero a acompañarlo a su oficina a lo que accedí custodiado por los Lcdos. Manuel Torres Reyes y Carlos Borges, quienes me ofrecieron calmantes los cuales rehusé ingerir. Que mientras me encontraba dentro de la oficina del Fiscal Grajales en compañía de éste, del Lcdo. Carlos Borges, de la División Legal de la Administración de Veteranos, y del Lcdo. Manuel Torres Reyes, el Juez Gallardo salió de su oficina hacia el sitio en donde estaba estacionado mi automóvil y se paseaba de un lado para otro mostrando en cinturón un revólver. Que luego pude salir del edificio cuando el Lcdo. José R. Fournier se personó dentro de la oficina del Fiscal Grajales y me informó que la continuación de la vista sobre aprobación de la transcripción de evidencia había sido suspendida y que el Juez Gallardo ya había reanudado la sesión de la corte.

"Testigos presenciales de estos hechos, según mi mejor recuerdo son: Lcdo. José R. Fournier, Lcdo. Antonio Cortés Cortés, Lcdo. Rafael Rodríguez Ema, Fiscal Fernando Grajales, Lcdo. Luis Archilla Laugier, Lcdo. José C. Jusino, Lcda. Agustina Cámara de San Miguel, Lcdo. José L. Feliú Pesquera, Lcdo. José J. Acosta, Lcdo. Cayetano Coll Pujols, Sr. Juan Amaral, Taquígrafo Repórter, Sr. Humberto Álvarez, Secretario del Tribunal, Lcdo. Manuel Torres Reyes, Lcdo. Carlos Borges y otros, entre éstos, el Subsecretario del tribunal, Sr. Martínez.

"Debo indicarle que tengo información que creo cierta por venir de las personas agraviadas, los compañeros don Edelmiro Martínez Rivera y su hijo, Lcdo. Edelmiro Martínez, Jr., que en ocasión en que el primero comparecía en un pleito ante el Juez Fernando Gallardo Díaz, fue

bajo las disposiciones de la sec. 24 de la Ley núm. 11 de 24 de julio de 1952, Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, 4 L.P.R.A., sec. 232, (2) y solicitó del Secretario de Justicia que radicara la correspondiente querella.

El día 20 del mismo mes de febrero presentó el Secretario de Justicia la querella contra dicho Juez, formulando los siguientes cargos:

"PRIMER CARGO.—Que el día 3 de mayo de 1957 mientras actuaba y desempeñaba sus funciones como Juez del Tribunal Superior de Puerto Rico, Sala de Bayamón, y en la Sala de Sesiones de dicho Tribunal en ocasión en que se celebraba la vista de una Solicitud de Enmiendas a la Transcripción de la Evidencia radicada por el Lic. César Andréu Ribas en la causa criminal número M-56–251 titulada 'El Pueblo de Puerto Rico contra Miguel Ángel Marín Canals', por Infracción al Artículo

---

desafiado e invitado a salir afuera a pelear por dicho magistrado, rehuyendo hacerlo el compañero Martínez Rivera por evitar un encuentro personal con un magistrado. Testigos: Lcdos. E. Martínez Rivera y Edelmiro Martínez Jr.

"Suplico se ordene una investigación inmediata de estos hechos; se cite al taquígrafo-repórter, Sr. Juan Amaral para que preste declaración y entregue una transcripción de la vista celebrada en 3 de mayo de 1957, y se suspenda de empleo y sueldo al querellado hasta tanto se ventile esta querella, para que todos los funcionarios de su tribunal y abogados puedan libremente declarar la verdad de lo ocurrido en dicha ocasión sin temor a represalias por parte del Juez Gallardo."

(2) "Si el Tribunal Supremo determinare que existe causa para ulteriores procedimientos, podrá solicitar del Secretario de Justicia o de cualquier funcionario del Tribunal que radique la correspondiente querella. El Secretario de Justicia también, a iniciativa propia, o por orden del Gobernador, podrá iniciar el procedimiento para la destitución de un juez y entonces actuará como querellante. El procedimiento se iniciará mediante querella dirigida al Tribunal Supremo imputándole al juez conducta inmoral o negligencia en sus deberes judiciales. El Tribunal dará a las partes la oportunidad de ser oídas, en unión a sus testigos y el Tribunal podrá en su discreción mientras se sustancia el procedimiento suspender al Juez de empleo y sueldo. Si el Tribunal considerare que los cargos, o parte de ellos, han sido probados, podrá censurar o suspender al juez querellado, o destituirlo permanentemente de su cargo según, bajo las circunstancias concurrentes, creyere que sea la pena más adecuada."

6 de la Ley de Armas de Puerto Rico, el Juez querellado Fernando Gallardo Díaz, quien presidía dicha vista, observó una conducta inmoral e impropia de un magistrado consistente en que al llamar la atención del abogado César Andréu Ribas sobre la forma en que este último redactó la mencionada Solicitud de Enmiendas se produjo entre ellos un cambio de palabras dichas en tono y actitud desafiantes, como resultado del cual el Juez querellado bajó violentamente de estrados habiéndose usado por éste lenguaje obsceno y ofensivo en alta voz, dando lugar a que se promoviera el correspondiente desorden y se interrumpieran los procedimientos que se estaban llevando a cabo en el Tribunal y a que tuvieran que intervenir varios abogados y otros funcionarios para evitar agresiones físicas entre el querellado y el Lic. César Andréu Ribas.

"SEGUNDO CARGO.—El querellado, Fernando Gallardo Díaz, actuando como Juez del Tribunal Superior de Puerto Rico, Sala de Bayamón, allá en o alrededor del día 6 de mayo de 1957 observó una conducta inmoral e impropia de un magistrado consistente en que redactó una carta para la firma del señor Armando Santini, Corresponsal del periódico 'El Imparcial' en Bayamón, y dirigida al Director de dicho periódico, Lic. Antonio Ayuso Valdivieso, y dictó la misma al taquígrafo del Tribunal Sr. Juan Amaral, e hizo copiar en dicha carta parte de la transcripción oficial del récord taquigráfico del incidente a que se refiere el primer cargo; que el querellado gestionó y logró que firmara la misma el Sr. Armando Santini a quien citó, por la vía telefónica, para que compareciera a su oficina para ese propósito; que en la mencionada carta se desmentía la información que en la edición correspondiente al día 6 de mayo de 1957 y bajo el título 'Juez Forma Escándalo en Corte y Desafía Abogado' publicó 'El Imparcial' en relación con el incidente a que se refiere el primer cargo; que al redactar dicha carta el querellado hizo figurar en ella varios hechos falsos a saber: Que el corresponsal Armando Santini se encontraba presente en Bayamón y en el antes mencionado incidente entre el querellado y el Lic. César Andréu Ribas; que el Sr. Armando Santini había leído la transcripción del récord taquigráfico de dicho incidente; y que el Sr. Armando Santini había dictado la referida carta; a sabiendas por el querellado de la falsedad de dichas afirmaciones; que dicha carta fue enviada por el Juez querellado al Lic. Ayuso Valdivieso con el propio Sr. Armando

Santini y copia de la misma fue dada a la publicidad por el querellado leyéndola en corte abierta mientras presidía el Tribunal en la sesión celebrada ese día 6 de mayo de 1957 habiendo expresado verbalmente el querellado antes de comenzar a leer la carta, el hecho falso de que la misma había sido escrita por el propio Sr. Armando Santini, todo ello en menoscabo del prestigio, la dignidad y el buen nombre del Tribunal y de la Administración de la Justicia."

En la súplica de la querella solicitó el Secretario de Justicia que previos los trámites legales correspondientes, se dictara una resolución "destituyendo permanentemente al querellado de su cargo como Juez del Tribunal Superior de Puerto Rico o en su defecto imponiéndole la pena que el Tribunal creyere más adecuada bajo las circunstancias concurrentes," y que, en el ejercicio de nuestra discreción se suspendiera de empleo y sueldo al querellado mientras se sustanciara el procedimiento de destitución.

Por resolución del 21 de febrero de 1958 dictada después de examinar la querella, este Tribunal suspendió de empleo y sueldo al juez querellado y mientras se sustanciara el procedimiento, dándosele vigencia inmediata a tal resolución.

Notificado en forma de la querella, el día 24 de febrero compareció el juez querellado representado por sus abogados Benjamín Ortiz y Yamil Galib y contra la misma radicó una moción pidiendo su desestimación por los siguientes fundamentos:

"1.—Los hechos expuestos en los dos cargos no son suficientes para demostrar conducta inmoral de parte del querellado.

"2.—El estatuto que ha servido de base para este procedimiento y para la radicación de la querella es inconstitucional, y priva al querellado de un debido proceso de ley, ya que dicha ley (4 L.P.R.A. 232) faculta a este Tribunal a resolver en definitiva sobre este caso, a pesar de que este Tribunal ya ha determinado previamente que existe causa para la querella y a pesar de que este mismo Tribunal que ha de resolver este caso fue el mismo Tribunal que ordenó la radicación de la querella."

En la misma fecha, separadamente, radicó una contestación a la querella negando, en términos generales, "todos y cada uno de los hechos alegados en los dos cargos que se le han formulado."

La vista de la querella comenzó el 19 de marzo de 1958, constituído el Tribunal en pleno, con excepción de los Jueces Asociados señores Pérez Pimentel y Saldaña, quienes por espontánea decisión personal, y tan pronto como se radicó la queja por el Lic. Andréu Ribas, se abstuvieron en absoluto de intervenir en el presente procedimiento. La vista prosiguió durante los días 20, 21, 24 y 25 de marzo, terminándose en la medianoche de este último día. En los demás días de vistas también se celebraron sesiones nocturnas. El querellado compareció en persona y asistido de sus abogados, y el Secretario de Justicia estuvo representado por los fiscales especiales generales, señores José C. Aponte y Guillermo A. Gil.

La moción de desestimación del querellado fue discutida por las partes mediante sendos escritos que oportunamente radicaron. Fue declarada sin lugar por resolución dada oralmente el día 19 de marzo, en el curso de la sesión de ese día y antes de comenzar el período de pruebas. (T. pág. 10.) En vista del resultado de este caso es innecesario consignar ahora los fundamentos de dicha resolución.

Ambas partes adujeron abundante prueba oral y documental. Con la presentación de extensos alegatos sobre los méritos quedó el asunto sometido a nuestra consideración.

Nuestra Constitución, en su Artículo V, Sección 11, nos impuso el cargo u obligación de resolver las querellas formuladas contra los jueces de los demás tribunales por las causas y mediante el procedimiento que se disponga por ley. Ese procedimiento se reglamentó por la sec. 24 de la Ley de la Judicatura de 1952, en la que se ordena que si este "Tribunal considerare que los cargos, o parte de ellos, han sido probados, podrá censurar o suspender al juez querellado, o destituirlo permanentemente de su cargo, según bajo las

circunstancias concurrentes, creyere que sea la pena más adecuada."

Con el fin de cumplir ese deber hemos estudiado cuidadosamente toda la prueba ofrecida y los informes escritos de las partes. En sus aspectos esenciales, la prueba de una parte está en fuerte pugna con la de la otra. Es en verdad sorprendente que hubiera testimonios tan opuestos sobre extremos importantes de la prueba. No nos podemos explicar estas hondas diferencias de percepción en personas que tuvieron igual oportunidad de observar de cerca los hechos. Con el deseo de dar a las partes la más amplia oportunidad de ser oídas, el Tribunal permitió a cada una la presentación de una serie de testimonios cuya sustancia había sido establecida por otros anteriores. Como resultado de ese estudio y la consideración de todos los elementos de prueba pertinentes, dirimimos el conflicto en la prueba y llegamos a las siguientes

### CONCLUSIONES DE HECHOS
#### Primer Cargo

1. El querellado Fernando Gallardo Díaz fue nombrado Juez de Distrito del Distrito Judicial de Bayamón el día 11 de junio de 1945, nombramiento que fue efectivo desde el 16 de junio de 1945, fecha en que juró y tomó posesión del cargo. Al abolirse las cortes de distrito en virtud de la Ley Orgánica de la Judicatura de Puerto Rico de 1950, efectiva el 1 de julio de ese año, pasó el querellado a ocupar el cargo de Juez del Tribunal de Distrito de Puerto Rico, Sección de Bayamón. Con la reorganización del sistema judicial verificada en 1952 pasó a ocupar el de Juez del Tribunal Superior de Puerto Rico. Exhibits 1 y 2 del Querellante.

2. Ante la Sala de Bayamón del Tribunal Superior se radicaron en el mes de octubre de 1956 dos acusaciones contra Miguel Ángel Marín Canals por infracciones a la Ley de Armas. La primera, de carácter grave, bajo el número G-56–198, en relación con el art. 8 de dicha ley. La segunda, menos grave, bajo el número M-56–251, por infracción al

art. 6, consistente en haber tenido en su posesión una pistola sin haber obtenido previamente una licencia expedida por el Jefe de la Policía de Puerto Rico. Las causas fueron sometidas conjuntamente a juicio presidido por el Juez Superior, Fernando Gallardo Díaz, en los días 24 y 25 de enero de 1957, representando a El Pueblo el fiscal Fernando Grajales y al acusado los abogados César Andréu Ribas y Gilberto Padró Díaz. En la grave, número G-56-198, juzgada por un jurado, el veredicto fue absolutorio. La menos grave, número M-56-251, fue decidida por dicho juez, quien declaró al acusado Marín Canals culpable y lo condenó a cumplir una pena de seis meses de cárcel. Exhibits 3 y 4, Querellante.

3. En el curso del juicio, y en la tarde de su primer día, ocurrió lo que sigue:

"Hon. Fiscal: En estos momentos nosotros vamos a plantear una cuestión . . .

"La Corte: El jurado pase afuera y no comente el caso entre sí, ni con nadie, ni forme opinión.

"Hon. Fiscal: Señor Juez, nosotros entendemos . . . Pedimos que se retire el testigo . . .

"La Corte: Sí, como no, que salga afuera el testigo.

"Hon. Fiscal: Entendemos, señor Juez, que la defensa en este caso como parte de su teoría y presentación de su prueba, lo que está haciendo es presentando manifestaciones exculpatorias de un tercero de acuerdo con la pregunta que en estos mismos momentos le ha hecho el compañero al testigo. La línea de preguntas va dirigida a través de este testigo a traer manifestaciones exculpatorias ocurridas después de haber la policía intervenido en este caso. Nosotros entendemos que eso es inadmisible en evidencia.

"La Corte: Hasta ahora no ha traído nada que no sea admisible. Su señoría mencionó eso y esto a lo que le dijo el testigo al fiscal.

"Hon. Fiscal: Nosotros entendemos que todas esas manifestaciones exculpatorias no son admisibles en evidencia.

"La Corte: Él ha dicho hasta ahora que viajó en el carro y fue a Palo Seco y vino la policía y se llevó a este señor. Lo que el testigo ha dicho hasta ahora, eso, es perfectamente admisible. El otro testigo dijo que el acusado le dijo que qué per-

sona lo había metido en un bollo: él dijo que no sabía. El otro testigo dijo que el único que se había metido dentro del carro era fulano de tal.

"Hon. Fiscal: Todo lo que declaró el testigo con relación a Maldonado . . .

"La Corte: El testigo empezó a decir algo y fue el mismo abogado quien impidió que lo dijera.

"Hon. Fiscal: Como estaba el testigo ahí.

"Defensa: Compañero eso es muy prematuro, adelantar lo que dicen los testigos. Compañero es muy prematuro.

"La Corte: ¿En este caso no había más gente por allí? Yo tengo que resolver el otro asunto. Allí había muchísima gente y el fiscal se limitó a coger declaraciones a los dos policías.

"Hon. Fiscal: Nosotros tenemos a los dos policías y además investigamos. He hecho gestiones para conseguir otros testigos.

"La Corte: El fiscal debe suponer que un caso que ocurre en una hora temprana de la noche y cuando hay mucha gente, tiene que adelantar que la defensa le va a decir al jurado

"¿señores cómo es posible que este asunto que ocurrió en un sitio público y los únicos testigos que traen los fiscales son los dos guardias habiendo tanto testigo en ese negocio? Su señoría (dirigiéndose al fiscal) pudo haber investigado a los que estaban en el negocio. Pudo hacerles preguntas de si vieron algo. Si dicen que no vieron nada, por ejemplo, ponerlo por escrito, que no saben nada y en esas circunstancias en un caso como éste después no pueden venir a la corte si declararon que no vieron nada a decir que vieron . . . Si es posible. A un ciudadano diga la verdad de lo que vio. Si es posible y eso les bastará. Pero los casos no se pueden llevar en esa forma.

"Hon. Fiscal: Nosotros, señor Juez, decimos que se pueden llevar con un testigo policía.

"La Corte: Se pueden llevar, pero el que va a juzgar tiene que conocer eso.

"Hon. Fiscal: Nosotros hicimos todas las gestiones pertinentes.

"La Corte: No puede dejarse eso. Si alguien le dijo que no sabía . . .

"Hon. Fiscal: Les pregunté a todos los testigos durante las investigaciones y al acusado quien no quiso declarar . . .

"La Corte: Es un derecho que él tiene.

"Hon. Fiscal: . . . Ni El Cano, se le preguntó y en ningún momento dijo haber visto nada de eso.

"La Corte: ¿Por qué no lo escribió? Si fue a la fiscalía yo le cojo una declaración y lo tengo amarrado.

"Hon. Fiscal: Si El Cano no estuvo en fiscalía en seguida. Eso fue un mes o mes y pico después de verse con el propio acusado, que este señor acusado quería que se le tomara esa declaración. Pero este señor acusado quería que se le tomara esa declaración. Pero este caso ocurrió en octubre 7, pues el 7 o el día 8 se investigó el caso.

"La Corte: Se hace venir a todo el mundo. Yo tomaba 60 declaraciones para utilizar 3. Yo lo sabía: lo ponía.

"Defensa: Yo voy a pedir que se eliminen las manifestaciones del fiscal con relación a que El Cano fue a su oficina.

"Hon. Fiscal: Yo retiro todo lo que dije.

"La Corte: El jurado no está aquí ahora.

"Defensa: Vuestro honor en esta misma semana desmintieron al compañero Grajales. Como lo que está diciendo es de memoria no quiero que conste en récord eso.

"Hon. Fiscal: Bueno . . . Yo retiro . . .

"La Corte: ¿Qué va a retirar?

"Hon. Fiscal: . . . Todo lo que dijo cuando estuvo en mi oficina.

"La Corte: Traiga el jurado márshal. El jurado está completo y es el mismo. El acusado está presente y los abogados. Traiga un testigo. Que venga el testigo que estaba declarando. Puede seguir la defensa preguntándole." (Exhibit 7, Querellante.)

4. Contra la sentencia condenatoria interpuso recurso de apelación el acusado y, en la misma fecha, 25 de enero de 1957, solicitó del tribunal que se ordenara la preparación de la transcripción de las notas taquigráficas tomadas en el curso del juicio. Así lo ordenó el tribunal el 29 de enero, notificándose de ello a Juan Amaral, taquígrafo que actuó en la vista de los casos.—Folios 8 y 9, Exh. 3, Querellante.

5. En 7 de marzo de 1957 radicó el taquígrafo Amaral una transcripción de evidencia, señalándose finalmente la vista para su aprobación, luego de varias suspensiones, para

el 3 de mayo siguiente.—Folios 14, 15, 16, 21, 22 y 23, Exh. 3, Querellante.

6. El 25 de marzo, el abogado César Andréu Ribas, en representación del acusado Marín Canals, presentó en la secretaría del Tribunal Superior, Sala de Bayamón, un escrito cuyo texto literal es el siguiente:

"En el Tribunal Superior de Puerto Rico, Sala de Bayamón.—El Pueblo de Puerto Rico, v. Miguel Ángel Marín Canals, acusado.—Crim. Núm. C-56-198, M-56-251—Por: Inf. Ley de Armas (Felony) (Misd.)—*Solicitud de Enmiendas a la Transcripción de la Evidencia.*—Comparece ahora el acusado por su abogado que suscribe y expone: 1.—Que recibió copia de la transcripción de la evidencia preparada, certificada y radicada por el taquígrafo-repórter, Sr. Juan Amaral, y encontrándose pendiente de aprobación por parte de este tribunal, a los efectos de perfeccionar la apelación interpuesta contra la sentencia dictada por el tribunal de derecho, el acusado somete la siguiente enmienda: 1.—Al terminar de presentar su prueba el Fiscal Grajales y luego de haber declarado los policías Aureliano Díaz y Manuel Ralat, el Juez Fernando Gallardo, preguntó al Fiscal Grajales: '¿Ésa es toda la prueba?' y al Fiscal contestarle afirmativamente, el Juez ordenó al Márshal sacara al Jurado de Sala, y se desarrolló un extenso diálogo entre el Juez y el Fiscal más o menos en los siguientes términos:

"Sr. Juez: ¿Usted me quiere decir que habiendo sucedido este caso en una barra ahí en Cataño, que está a dos minutos de aquí, usted tan sólo trae a declarar a los dos policías, y que usted no le ha tomado declaración ni al dueño de la barra, o encargado de la misma, ni a ningún otro ciudadano? Fíjese que yo tengo la responsabilidad de resolver uno de estos dos casos, que son felony uno y el otro misdemeanor, y esa investigación es muy deficiente. Yo cuando era Fiscal en Guayama y en San Juan y se daba un caso como éste no me conformaba con lo que me dijera la policía, sino que me iba al sitio, le cogía declaración a todos los testigos y a cuanta persona pudiera haber estado presente, aunque fuera para decirme que no sabían nada del asunto. Así no me podía la defensa traer esos testigos a decir que vieron esto y aquello otro porque ya yo los tenía amarrados con una declaración de que no sabían nada.

"Fiscal Grajales: Ésa es toda la prueba que tiene el Pueblo, y ése es el caso; yo no puedo hacer nada más.

"Sr. Juez: Pues mire, ahora el acusado trae al administrador de ese negocio y a otros ciudadanos que presenciaron el arresto, los tiene ahí afuera de testigos y El Pueblo ha podido investigarlos antes. Receso.

"2.—Que estas manifestaciones fueron dichas en el curso del juicio por el magistrado y por el Fiscal; forman parte de lo que ocurrió y debe ser transcrito íntegramente y ha sido eliminado indebidamente, y ello debe ser intercalado en el sitio indicado de la transcripción de la evidencia.

"3.—Que durante el receso el abogado del acusado se acercó al Sr. Amaral, y luego en la propia oficina de éste, consiguió que se le leyeran las manifestaciones que ahora no aparecen de la transcripción, razón por la cual, *tiene motivos para creer que no ha sido, ni se trata de una omisión involuntaria al transcribir sus notas sino que esas frases fueron eliminadas de la transcripción luego de conocerse por el tribunal de la intención de apelar que manifestó el acusado en corte abierta, al solicitar se le fijara fianza para hacerlo.* Por lo expuesto, el acusado suplica de este tribunal se sirva ordenar que por el taquígrafo-repórter, Sr. Juan Amaral, se proceda a intercalar en el sitio que corresponde en la transcripción de la evidencia (página 48, antes de que se recesara para ir a almorzar y luego de haberse presentado en evidencia, sin objeción del acusado, la pistola y las balas) todas las palabras, frases y manifestaciones antes transcritas y propuestas como enmiendas por el acusado, y que fueron dichas en corte abierta, en el transcurso del juicio por el Juez Fernando Gallardo Díaz dirigidas al Fiscal Grajales y las dichas por éste, de manera que la transcripción vaya completa a la consideración del Hon. Tribunal Supremo de Puerto Rico, a lo cual tiene derecho el acusado. San Juan, Puerto Rico, a 21 de marzo de 1957. (Firmado) C. Andréu Ribas, abogado del acusado apelante." (El subrayado parcial del párrafo 3 fue hecho por el juez querellado, con un lápiz azul, "el lunes o martes después del incidente . . . en la Secretaría del Tribunal."— R. 1106.) Folios 18–20, Exh. 3, Querellante.

7. En la lista de señalamientos de casos para el día viernes 3 de mayo de 1957, estaban incluídos, además del incidente sobre aprobación de la transcripción del caso de Marín

Canals (que estaba en tercer turno), otros 47 asuntos, entre ellos: quince divorcios en rebeldía, ocho desahucios en precario en primera audiencia, cinco mociones en asuntos contenciosos, cinco desacatos en pleitos sobre alimentos, dos lecturas de sentencias y otros doce expedientes ex parte y mociones de distinta naturaleza. En esa lista figuraban los nombres de unos veinticinco abogados de los respectivos litigantes, peticionarios o acusados y el del Fiscal Grajales en los casos en que El Pueblo era una de las partes.—Exh. D, Querellado.—Unos 44 casos fueron vistos.—Folios 187–197, Libro de Minutas Núm. 71, Exh. 5, Querellante.—En la mañana de ese día el Salón de Sesiones de la Sala de Bayamón del Tribunal Superior, presidida por el juez querellado, se encontraba muy concurrido; casi todos los asientos destinados al público estaban ocupados; parte de los abogados permanecía de pie, viéndose algunos obligados a permanecer en los pasillos del tribunal.—R-51, 255, 326, 538, 592.

8. Llamado en la mañana de ese día el caso de Marín Canals a los fines de la aprobación de la transcripción de evidencia, ocurrió entre el Juez Gallardo Díaz y el abogado César Andréu Ribas el siguiente diálogo:

"DEFENSA: Lic. César Andréu Ribas: Yo propuse unas enmiendas al récord taquigráfico, que están unidas al expediente de este caso. Su señoría recordará que el día del juicio y después de terminarse de practicar las declaraciones juradas de los policías que aparecían al dorso de la acusación, vuestro honor ordenó que se retirara el jurado y le preguntó al fiscal Grajales 'si esa era la prueba del caso'; eso fue después que presentó en evidencia el revólver y las balas. Y entonces su señoría hizo ciertas manifestaciones dirigidas al fiscal, las cuales, vuestro honor, este abogado las tomó lo más rápidamente posible en manuscrito, porque yo no soy taquígrafo, que en síntesis son las siguientes, que aparecen de la 'Solicitud de Enmiendas a la Transcripción de la Evidencia';

"LA CORTE: HON. F. GALLARDO DÍAZ,

"JUEZ: ¿Eso fue en ausencia del jurado?

"DEFENSA: Sí, vuestro honor. Voy a leer el incidente. '¿Ésa es toda la prueba?', y al fiscal contestarle afirmativamente, el juez ordenó al márshal sacara al jurado de Sala, y se desarrolló un extenso diálogo entre el Juez y el fiscal, más o menos en los siguientes términos: hablando el Sr. Juez: ¿Usted me quiere decir que habiendo sucedido este caso en una barra ahí en Cataño, que está a dos minutos de aquí, usted tan sólo trae a declarar a los dos policías, y que usted no le ha tomado declaración ni al dueño de la barra, o encargado de la misma, ni a ningún otro ciudadano? Fíjese que yo tengo la responsabilidad de resolver uno de estos dos casos, que son felony uno y el otro misdemeanor, y esa investigación es muy deficiente. Yo cuando era fiscal en Guayama y en San Juan y se daba un caso como éste no me conformaba con lo que me dijera la policía, sino que me iba al sitio, le cogía declaración a todos los testigos y a cuanta persona pudiera haber estado presente, aunque fuera para decirme que no sabían nada del asunto. Así no me podía la defensa traer esos testigos a decir que vieron esto y aquello otro porque yo los tenía amarrados con una declaración de que no sabían nada . . .

"LA CORTE: Si yo en mi vida he usado la palabra 'amarrado' . . .

"En este momento el Taquígrafo se dirige al Hon. Juez y dice: El incidente está transcrito, y le hace entrega de su original, porque ya en 27 de marzo de 1957 les había servido copias del mismo a los abogados de las partes.

"LA CORTE: . . . Yo me acuerdo que hubo algo de eso.

"DEFENSA: Me voy a permitir vuestro honor seguir leyendo. Después el señor Grajales le contestó:

"'Ésa es toda la prueba que tiene el Pueblo, y ése es el caso; yo no puedo hacer nada más.'

"Yo recibí copia de la transcripción del incidente acompañada de una carta del taquígrafo, señor Amaral, que es un funcionario para quien tengo un gran respeto, y ahora quiero decirlo públicamente, que lamento todo este incidente, y con perdón de vuestro honor quiero hacer constar que tenía y tengo muchos deseos de hacer constar públicamente, aquí, ante el foro el concepto que tengo del señor Amaral . . .

"Entonces leí la transcripción del incidente que yo he alegado estaba omitida en la Transcripción de Evidencia, y ví que el incidente transcrito por el Sr. Amaral es, más o menos, lo

mismo que yo tomé en manuscrito, pero con más detalles, y estoy conforme con el incidente.

"Pero yo quiero decir también que yo tengo que velar por los derechos de mi representado en apelación. Por eso radiqué esa moción, vuestro honor, que acabo de leer solicitando enmiendas al récord taquigráfico.

"Después recibí la carta del Sr. Amaral, señor Juez, con la que me acompañaba las páginas 79, 79A, 79b, 80 y 81, carta en la cual el Sr. Amaral realmente me hace una protesta, y me dice lo siguiente:

" 'Le incluyo con la presente los pliegos adicionales que deben intercalarse en la Transcripción de Evidencia del caso del Sr. Marín Canals, que contienen el incidente que involuntaria e inadvertidamente omití transcribir. Lo lamento profundamente porque esa omisión ha dado margen a que su señoría impróvidamente, —hay un paréntesis—que dice 'de esto estoy seguro, pues nosotros hemos sido buenos amigos', y sigue 'haya consignado ciertas manifestaciones en su escrito de enmiendas. Cuando recordemos lo que hablamos en ese día 25 de enero quedará plenamente esclarecida la verdad y su señoría, con ese gesto noble que lo caracteriza, pedirá que se eliminen del récord. Mientras tanto, quedo, como siempre a sus órdenes, atto. amigo y s. s.'

"DEFENSA: De manera, pues, que yo acepto en primer lugar que fue una omisión involuntaria por parte del Sr. Amaral. Acepto también que lo transcrito en estas páginas que el señor Amaral me envió con su carta es lo correcto. Eso era todo lo que yo tenía que decir con respecto a las enmiendas.

"Ahora quiero decir algo con respecto al Sr. Amaral, porque quería decirlo aquí delante de la corte, de sus funcionarios, del público y de los miembros del foro, que es lo siguiente 'tengo un gran concepto del Sr. Amaral como funcionario y en todos sus órdenes, es un ciudadano correcto, es un funcionario correcto y honesto y no le había contestado su carta porque quería decirlo aquí ante el tribunal.'

"LA CORTE: *Yo nunca había leído esto, ni sabía que esto había pasado, hasta este momento. Pero veo aquí que su señoría al referirse a mi, me dice 'el Juez Fernando Gallardo', 'Sr. Juez', y a mí no me importa que no me digan 'honorable', porque yo sé que soy honorable aunque usted no lo crea . . .*

"DEFENSA: *Perdóneme la Corte . . . Yo no he venido aquí para que su señoría aprovechándose de que es juez me venga con esas cosas . . .*

"LA CORTE: *Pues yo se lo digo aquí y fuera de la corte y donde quiera . . .*

"DEFENSA: *Eso es lo que yo quiero . . . Véngase . . . véngase . . .*

"LA CORTE: *Receso."* (Folios 3–35, Exh. 3, Querellante. (Bastardillas nuestras.)

9. Durante el diálogo anterior, el juez se encontraba sentado; el abogado Andréu Ribas de pie, frente a la mesa del secretario. Dando un manotazo sobre su escritorio, el juez decretó un receso, se puso súbitamente de pie —R. 289; — giró hacia su derecha, bajó de su estrado y empezó a caminar hacia el sitio donde estaba el licenciado Andréu Ribas, quien se encontraba cerca de la mesa de los abogados del tribunal. —R. 250, 323, 335.—Ambos se encontraban excitados y nerviosos. Entonces el alguacil Juan Ramón Rivera Ayala, "Temiendo que pudiera ocurrir algo" —R. 552—interceptó al juez Gallardo Díaz y "lo agarró por los brazos" —R. 358, 499, 882—impidiéndole que avanzara.—R. 525.—Intervinieron con el juez también el alguacil auxiliar y "un sinnúmero de abogados," que le aconsejaban que tuviera calma —R. 529, 553—y lo empujaron o echaron—R. 70, 453–499— hacia un pequeño pasillo que conduce al salón de jurados; en el momento en que lo acababan de entrar en ese pasillo y estando todavía cerca del dintel de la puerta que da al mismo, el Juez Gallardo Díaz le dice a los que lo sujetaban: "Suéltenme, que éste no es más que un pendejo." —R. 290, 500. A estas palabras el abogado Andréu Ribas, con quien habían intervenido el Fiscal Grajales y otros abogados —R. 249—contestó: "Más pendejo es usted." R. 500.

10. Llevaron al juez a su oficina donde tomó una pastilla de equanil. —R. 114. —A Andréu Ribas lo tomó por el brazo el Fiscal Grajales, lo sentó en una butaca y luego lo llevó a fiscalía; allí le ofreció un calmante, pero no lo

tomó. —R. 328. De su oficina salió el juez y bajó de la planta alta del edificio hacia el sitio donde tenía estacionado su automóvil con la "idea de ir a mi automóvil y sacar el revólver del 'dash' y traérmelo", cambió de idea y regresó sin el revólver, reanudando la sesión del tribunal. R. 1115. De la oficina del fiscal se fue Andréu Ribas para San Juan, donde atendió otros asuntos. —R. 49, 328.

11. Como resultado del incidente entre juez y abogado, fueron interrumpidos por algún tiempo los procedimientos. —Unos testigos declararon que la interrupción duró cuarenta y cinco minutos—R. 376; otros treinta—R. 537; otros veinticinco—R. 532; otros "no menos de quince", —R. 362.

No se produjo una situación de verdadero pánico en los momentos en que juez y abogado, excitados y nerviosos, se dirigían, en voz que todos pudieron oír, términos ofensivos o provocativos; sin embargo, del conjunto de la prueba se infiere que funcionarios, abogados, litigantes de ambos sexos y el público allí congregado (entre el cual se encontraba una niñita de unos siete años de edad—R. 817) sintieron el temor de un serio e inminente encuentro personal entre el magistrado y el abogado; [3] parte del público abandonó sus asientos, algunos abogados se retiraron a los pasillos; se formaron dos grupos que intervenían con ellos; quedó alterado el orden y el comedimiento usual, y se creó, momentáneamente, un estado de alarma y confusión, en aquella Sala de Justicia. —R. 51, 203, 291, 346, 361, 368, 375, 514, 545, 551, 556, 560, 564, 568, 571, 581, 591, 600, 610, 660, 661, 883, 888, 891, 892, 1082.

12. En el año 1942 surgió una relación de enconada enemistad personal entre el juez querellado Fernando Gallardo Díaz y el abogado César Andréu Ribas que, con apa-

---

[3] En la carta del 6 de mayo dictada por el propio juez a pedimento de Santini—Ex. 12, Querellante—en parte se dice: "Según el fiscal el abogado estaba armado de un revólver o pistola, pero aunque el juez, según su informe no estaba armado, *no se acobardó, pero los abogados se metieron por el medio y de ahí no pasó el asunto.*"

rentes períodos de enfriamiento, ha persistido a través de los años, manifestándose en distintas formas. —Exhibit 15, págs. 57–62, Querellante; Exhibits A, B, F, J, K y L, Querellado.

13. En la transcripción de evidencia preparada por el taquígrafo Juan Amaral y que éste radicó el 7 de marzo de 1957, dicho taquígrafo incurrió en la omisión del diálogo entre juez y fiscal que se inserta en la Conclusión núm. 3 que precede y que tuvo lugar en la tarde del 24 de enero de 1957, en ausencia del jurado, durante el juicio contra Marín Canals y luego de haber anunciado el fiscal la terminación de su prueba; en ninguna forma el juez querellado tuvo intervención en la comisión de esa omisión. Exh. 6, Querellante; R. 398, 431, 469, 471.

### Sobre el Segundo Cargo

14. Armando Santini Berríos, agente corresponsal en Bayamón del diario "El Imparcial" no presenció el incidente de la mañana del viernes 3 de mayo de 1957. Cuando ocurrió, se encontraba en el edificio de dicho periódico situado en San Juan. Regresó a Bayamón cerca del mediodía y allí, por primera vez, recibió información de un amigo comerciante sobre lo sucedido esa mañana en la sala del Tribunal Superior. —R. 681. Después de la una de la tarde, y luego de hablar con uno de los secretarios auxiliares del tribunal, visitó al Juez Gallardo Díaz, en su oficina, con el propósito de obtener del magistrado información sobre el asunto, y entre ellos, se conversó lo que sigue:

*Santini:* "Estaba afuera; al llegar aquí me han explicado que César Andréu lo desafió y me han dado detalles. ¿Qué abuso le hizo a usted César Andréu en la corte? Yo quiero que usted me dé su versión, lo que usted sepa, para yo comunicarlo a 'El Imparcial'."

*Juez Gallardo Díaz:* "Deja eso. No quiero dar 'statement' ni decir nada."

*Santini:* "Mire, licenciado, es que él ahorita va a decir otra cosa por ahí."

*Juez Gallardo Díaz:* "Mira, eso que te dijeron abajo es la verdad."

*Santini:* "Usted me deja llamar por su teléfono a 'El Imparcial'."

*Juez Gallardo Díaz:* "Como no."    —Exh. 15, Querellante, pág. 30–Cf. R. 1112.

15. Tomó Santini Berríos el teléfono y habló con Barbosa Aquino, empleado de "El Imparcial" trasmitiéndole la información que había recogido sobre el incidente.—Exh. Ñ, Querellado; R. 1117.

16. En la mañana del día siguiente, sábado 4 de mayo, el taquígrafo Juan Amaral preparó una transcripción de las notas taquigráficas que había tomado en relación con el incidente entre el juez y abogado del día anterior. Exh. 3, Querellante; R. 442, 443. Dicho taquígrafo entregó la transcripción al Juez Gallardo Díaz en esa misma mañana en los momentos en que dicho juez concurría a un almuerzo brindado por el Comité de Fiestas Patronales de Bayamón a todos los abogados de la ciudad.  A ese almuerzo asistieron muchos abogados y también Santini Berríos.  En esa ocasión, uno de los abogados, estando presente y muy cerca de él Santini Berríos, leyó en alta voz la transcripción del incidente preparada por el taquígrafo Amaral. —R. 502, 685, 901, 986, 1121.  Santini la tuvo en sus manos y la ojeó. R. 986.

17. En la edición del periódico "El Imparcial" correspondiente al día lunes 6 de mayo de 1957, cuya circulación pública empezó la tarde del domingo anterior, apareció una información con las siguientes letras titulares: "JUEZ FORMA ESCÁNDALO EN CORTE Y DESAFÍA ABOGADO." (⁴) Exh. 13, Querellante.

---

(⁴) El texto de la información es el siguiente:

"JUEZ FORMA ESCÁNDALO EN CORTE Y DESAFÍA ABOGADO.—Acusando a Fernando Gallardo Díaz de observar en corte abierta una conducta

El Juez Gallardo Díaz leyó esa información en su hogar la noche del mismo domingo 5 de mayo. Consideró que la versión del incidente entre él y Andréu Ribas que daba al público ese periódico era incorrecta, que no concordaba con la que el agente corresponsal Santini Berríos le había trasmitido por teléfono desde su oficina, y pensando en la posibilidad de que Santini Berríos hubiera trasmitido al periódico, en el mismo viernes, por otro teléfono, la información publicada cambiando "todo lo que él me había dicho a mí," —R. 1122—se comunicó por teléfono con Santini Berríos. Éste le dijo que "estaba indignado y . . . que no era la primera vez que a Barbosa Aquino él le daba una información y se la cambiaba y que ya le estaba diciendo la gente embustero." R. 1122. Entonces Santini Berríos pidió al juez le redactara una carta dirigida al licenciado Ayuso, su patrono, "indicándole todo, y . . . precisamente le pusiera lo último que aparecía en los papeles que se habían

---

impropia de un juez y de un caballero, al formar un escándalo pronunciando palabras obscenas sin respeto alguno para las damas y niñas que se hallaban en la Sala del Tribunal, y desafiándolo en actitud violenta, el Lic. César Andréu Ribas se propone plantear ante el Comité de Quejas del Colegio de Abogados la misma querella que ya ha formulado ante la Administración de Cortes y el Tribunal Supremo. El incidente, que creó un estado de pánico y de confusión en el Tribunal Superior de Bayamón cuando mujeres y niños desalojaron la sala en precipitada huída, se produjo el viernes. Su origen se atribuye a que el Lic. Andréu Ribas no trató de 'honorable' al juez Gallardo en una moción solicitando que se incluyeran en el récord taquigráfico del proceso que por Ley de Armas se siguió contra el ingeniero Miguel Ángel Marín Canals, de Yabucoa, ciertas manifestaciones en las que Gallardo increpaba al fiscal Fernando Grajales por lo que entonces llamó 'deficiencias en la investigación del caso'.

"Después que el ingeniero Marín Canals fue absuelto por el Jurado en el caso *felony* y condenado a seis meses de cárcel por el juez Gallardo, el Lic. Andréu apeló para el Supremo y al recibir la transcripción de la evidencia comprobó que se habían omitido las precitadas manifestaciones del juez Gallardo contra el fiscal Grajales, a quien censuró porque al investigar el caso se conformó con la declaración de los policías Ralat y Díaz y no fue a Cataño, al sitio donde ocurrieron los hechos.

"El viernes habría de discutirse la referida moción para enmendar el récord taquigráfico y al iniciarse la sesión Andréu Ribas hizo constar que poco después de haber radicado su moción de enmiendas recibió del

leído en la Plaza del Mercado", o sea en el almuerzo del sábado anterior. —R. 1122, 1123.

En la mañana del siguiente día, lunes 6 de mayo, el Juez Gallardo Díaz, en su oficina, sin la presencia de Santini Berríos, dictó al taquígrafo Juan Amaral, y éste mecanografió la carta que dicho corresponsal le había pedido al juez que le dictara. Cuando llegó Santini Berríos a la oficina del juez, éste le entregó la carta; la leyó Santini Berríos, firmó su original y una copia que dejó al juez. Santini Berríos pidió que se le agregara una postdata a la carta porque "quería aparecer que yo fui el que dicté la carta." El juez le dijo que "eso era cosa de él" (de Santini) y llamó

---

taquígrafo Juan Amaral una transcripción complementaria de tres páginas, que involuntariamente había omitido y que eran justamente las manifestacioes de Gallardo. Como no hubo objeción alguna del fiscal Grajales, Andréu tuvo frases de reconocimiento para la honestidad del taquígrafo Amaral, y se disponía a retirarse de la Corte cuando se produjo un diálogo más o menos en la siguiente forma:

"*Gallardo*: Oiga (al Lic. Andréu Ribas), venga acá. Yo no había leído su moción y veo que aquí usted no me llama honorable, sino juez Gallardo Díaz. A mí no me importa que usted me considere o no honorable, porque yo sé que soy honorable, muy honorable.

"*Andréu Ribas*: Bendito sea Dios, señor Juez. Yo no he venido aquí para que usted me maltrate, ni tengo la obligación de llamarle honorable a usted. No hay nada irrespetuoso en que yo lo llame juez, y usted no debe aprovechar su cargo de juez para en sala increparme, porque no he hecho nada para molestarlo a usted.

"*Gallardo*: Pues yo no se lo digo porque estamos en Sala y yo soy el juez. Véngase para afuera para que usted vea.

"*Andréu Ribas*: Ya mismo voy para fuera, porque ya es distinto.

"En ese momento el Juez Gallardo giró en su sillón y bajó con la aparente intención de salir, pero su secretaria Ana Delia y el márshal lo sujetaron y mientras trataban de llevarlo a su oficina, Gallardo gritaba '¡Suéltenme, déjenme, que éste no es más que un p . . .!' a lo que Andréu Ribas, rodeado por el fiscal Grajales y por los licenciados Manuel Torres Reyes, José C. Jusino, Agustina Cámara de San Miguel, Luis Archilla Laugier y José Acosta, le respondió: '¡más p . . . es usted!'

"En tanto que esa escaramuza se desenvolvía entre el juez y el abogado, un grupo de damas que estaban en la sala de la Corte trataron de salir desesperadamente del Tribunal, gritando para recoger a sus hijos y produciéndose una confusión y un pánico que milagrosamente no causó alguna desgracia o lesionados. Finalmente el juez Gallardo fue acompañado a su oficina y el Lic. Andréu Ribas hasta su automóvil, marchándose sin que se resolviera finalmente el caso de la moción."

al taquígrafo y a éste le explicó Santini Berríos en qué sentido deseaba la postdata. Amaral redactó la postdata. Después se despidió Santini Berríos de la oficina del juez. Exh. 15, págs. 81 y 82, Querellante; —R. 786, 787, 1123, 1124. (⁵)

18. Al comenzar la sesión del tribunal el lunes 6 de mayo, el juez querellado, en corte abierta y estando presentes dos fiscales, tres abogados, el secretario, el alguacil y treinta y seis jurados, se expresó en los siguientes términos:

"La Corte quiere hacer constar para que aparezca en las actas que en el periódico 'El Imparcial', correspondiente al día de hoy aparece una información que es un desdoro, si fuera cierta, para este tribunal. Es una información carente absolutamente de verdad. Al principio creí yo que el corresponsal de 'El Imparcial', en Bayamón había dado esa información. Pero él me ha hecho la salvedad de que él dio una información y es al revés de lo que aparece en 'El Imparcial', y que eso fue cosa del periódico, que no sabe quién la redactó, aunque él se comunicó con el redactor Barbosa Aquino, a quien le diera la información. Pero para satisfacción del tribunal, el propio corresponsal de Bayamón, le ha escrito una carta en el día de

---

(⁵) La carta, Exh. 12, Querellante, dice:

"Bayamón, Puerto Rico, mayo 6, 1957.—Sr. Antonio Ayuso Valdivieso, 'El Imparcial,' San Juan, Puerto Rico. Mi estimado don Antonio: Usted sabe que he sido el corresponsal y agente de su periódico en Bayamón por muchos años y he sido siempre correcto y honesto con el periódico y con todo el mundo y soy una persona seria. Pero es el caso que en 'El Imparcial' de hoy y en la página 4 aparece una información titulada 'Juez forma escándalo en corte y desafía abogado.' En el incidente a que se refiere esa información no había ningún corresponsal del periódico en Bayamón que no fuera yo, e inmediatamente me comuniqué por teléfono con el redactor Barbosa Aquino y le di todos los detalles sobre el asunto. Para mi gran sorpresa, al leer la información que aparece en la página aludida sobre la cuestión que le hablo, los hechos expuestos no fueron los que yo diera, que eran y son los veraces, sino una serie de falsedades que hacen daño al periódico, pues todos los que me encuentran y han leído la información de que le hablo, sólo me dicen: ¡Qué embustero eres Santini, yo estaba en la corte y lo que sucedió es distinto a lo que tú has puesto! Tengo que dar la explicación a estos ciudadanos que así se dirigen a mí y eso realmente es muy desagradable.

"Yo le informé a Barbosa Aquino que el licenciado Andréu Ribas había desafiado al Juez Gallardo en corte abierta con motivo de cierta discusión sobre la aprobación de un récord taquigráfico en un caso que

hoy al Director del periódico protestando de que diera una información falaz de cómo ocurrieron los hechos . . . Y allá se la cambiaron toda y se ha visto una información en el periódico a base de falsedades. Que eso no confiere poder, porque ni a él, porque van a creer que tanto él como el periódico son embusteros, y por eso es que pide eso al Director.

"Queremos hacer constar estas manifestaciones, porque el que lee 'El Imparcial' cree que aquí el que presidió el tribunal es un *ganster*, y yo no he sido *ganster*, ni semejante a *ganster*, ni he sido abogado *ganster*, ni nunca he estado asociado con *gansters*. Por el contrario me torno orgulloso de cuando era fiscal de Guayama y fiscal de San Juan.

"Claro que la información que dio el periódico, que da el periódico en la forma que está expuesta sí parece que aparece que fue inspirada por un asociado de gansters, porque ésas son las cosas que producen la gente de esta categoría.

"La carta dice así: El Hon. Juez da lectura a la carta desde donde dice 'Bayamón, Puerto Rico', hasta donde dice 'se la he dictado'." Folios 197–198, Exh. 5 y Exh. 14, Querellante.—

Hasta aquí las conclusiones del Tribunal sobre hechos que estimamos pertinentes a los cargos formulados, las cuales hemos derivado de aquellos testimonios que, en todo o en parte, nos han merecido crédito y de la eficacia probatoria que a cada pieza de evidencia documental hemos concedido.

---

sobre portar armas se sigue contra el ciudadano Miguel Ángel Marín. Yo le informé, además, que quien promovió el escándalo fue el licenciado Ribas y cuando el juez dio un receso el abogado se fue al lado del fiscal Grajales en una esquina donde se paran los abogados. Según el fiscal el abogado estaba armado de un revólver o pistola, pero aunque el juez, según su informe, no estaba armado, no se acobardó, pero los abogados se metieron por el medio y de ahí no pasó el asunto. No hubo tal pánico como describe el periódico en su información ni en ninguna otra forma. También dice esa información que la secretaria del juez se metió por el medio cuando esa secretaria estaba en su casa enferma desde hace varios días. En fin, don Antonio, la información que aparece en 'El Imparcial' es muy distinta a la verdad y más bien parece un invento. Yo he leído el récord que sacó el taquígrafo seguida y le voy a copiar, para que usted vea, lo que sigue:

"'La Corte: Yo nunca había leído esto, ni sabía que esto había pasado, hasta este momento. Pero veo aquí que su señoría al referirse a mí, me dice 'el Juez Fernando Gallardo', 'Sr. Juez', y a mí no me importa que me digan 'honorable', porque yo sé que soy honorable aunque usted no lo crea. . . .

Pasaremos a exponer en opiniones separadas—según indicamos en nuestra resolución de 13 de noviembre de 1958 ordenando el archivo de la querella y la reinstalación del querellado en su cargo de Juez Superior, al no poder llegar el Tribunal a un acuerdo de mayoría sobre el particular—los distintos criterios en cuanto a si los hechos contenidos en las conclusiones precedentes son suficientes para considerar que los cargos, o parte de ellos, han sido o no probados y, en caso afirmativo, si bajo las circunstancias concurrentes procedía censurar o suspender, o destituir permanentemente de su cargo al juez querellado.

---

Opinión del JUEZ PRESIDENTE SR. NEGRÓN FERNÁNDEZ, en la cual concurre el JUEZ ASOCIADO SR. SERRANO GEYLS.
San Juan, Puerto Rico, a 12 de marzo de 1959.

He sostenido el criterio de que los cargos formulados en la querella quedaron suficientemente establecidos por la prueba y que los hechos justificaban una suspensión del querellado de su cargo de Juez Superior, aun cuando no su destitución. Paso a exponer ahora las razones en que fundé ese criterio.

---

"'DEFENSA: Perdóneme la Corte . . . Yo no he venido aquí para que su señoría aprovechándose de que es Juez me venga con esas cosas . . .

"'LA CORTE: Pues yo se lo digo aquí y fuera de la corte y donde quiera . . .

"'DEFENSA: Eso es lo que yo quiero . . . Véngase . . . Véngase . . .

"'LA CORTE: Receso.'"

"Le escribo esta carta para dejársela con Héctor en 'El Imparcial', ya que me es difícil verle personalmente, pues usted no tiene hora segura de ir al periódico.

"Yo le voy a dar copia de esta carta al Juez Gallardo para que vea que el corresponsal de 'El Imparcial' en Bayamón no ha sido, ni es un embustero. Créame siempre su amigo (firmado) Armando Santini. —Post Data: Esta carta se la escribo en maquinilla porque el señor Amaral, Taquígrafo, ha tenido la bondad de hacérmela, según se la he dictado."

## I

La Sección 1 del Artículo V de nuestra Constitución dispone que: "El Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley." La Sección 11 del mismo Artículo V dispone que los Jueces del Tribunal Supremo podrán ser destituídos por las causas y mediante el procedimiento que la Constitución establece en la Sección 21 del Artículo III (proceso de residencia), y que "Los jueces de los demás tribunales podrán ser destituídos por el Tribunal Supremo por las causas y mediante el procedimiento que se disponga por ley."

La Asamblea Legislativa de Puerto Rico, en el ejercicio de la autoridad conferídale por la Sección 2 del propio Artículo V, dejó estructurado, en virtud de la Ley núm. 11 aprobada el 24 de julio de 1952—Ley de la Judicatura— nuestro sistema judicial. Habiendo creado un Tribunal de Primera Instancia integrado por el Tribunal Superior y el de Distrito, por la sec. 24 de dicha ley instrumentó la disposición constitucional de la Sección 11 relativa a la destitución de los jueces de "los demás tribunales", disponiendo que si el Tribunal Supremo—luego de practicada la investigación que creyere conveniente respecto a cualesquiera cargos que se formularen contra cualquier juez del Tribunal de Primera Instancia— "determinare que existe causa para ulteriores procedimientos, podrá solicitar del Secretario de Justicia o de cualquier funcionario del Tribunal que radique la correspondiente querella", y el Secretario de Justicia también, "a iniciativa propia, o por orden del Gobernador, podrá iniciar el procedimiento para la destitución de un juez y entonces actuará como querellante", disponiendo seguidamente que "El procedimiento se iniciará mediante querella dirigida al Tribunal Supremo *imputándole al juez conducta inmoral o negligencia en el desempeño de sus deberes judiciales*", pudiendo el Tribunal "en su discreción mientras se sustancia el procedimiento suspender al Juez de empleo y

sueldo." Si luego de dar a las partes la oportunidad de ser oídas, en unión a sus testigos, "el Tribunal considerare que los cargos, o parte de ellos, han sido probados, *podrá censurar o suspender* al juez querellado, *o destituirlo* permanentemente de su cargo según, bajo las circunstancias concurrentes, creyere que sea la pena más adecuada". (Bastardillas nuestras.)

La disposición constitucional en el sentido de que "los jueces de los demás tribunales podrán ser destituídos por el Tribunal Supremo por las causas y mediante el procedimiento que se disponga por ley", va dirigida a que se supla, por acción legislativa, un medio sustituto al de *residencia* (*impeachment*) provisto en la Constitución para la destitución del Gobernador, del Contralor y de los jueces del Tribunal Supremo, pero con idéntico fin: la *destitución* de los jueces de los demás tribunales; y tiene, de un lado, el alcance de señalar a este Tribunal como el único foro con autoridad para expulsar dichos jueces de sus cargos y, de otro, el de establecer el mandato de que la Asamblea Legislativa fije las causas y el procedimiento para esa expulsión.

La citada disposición, sin embargo, no limitó la autoridad de la Asamblea Legislativa—en el uso de los plenos poderes que le pertenecen—para fijar, como fijó en la sección 24 de la ley, otras penalidades disciplinarias por conducta que, siendo impropia en un magistrado, no fuere de tal naturaleza que hiciera imperativa su remoción del cargo. Y aún cuando en lo relativo a la *destitución* en sí, el precepto constitucional opera como una limitación a la autoridad de este Tribunal para, por vía de desaforo, expulsar a un juez de su cargo(¹)—ya que en virtud de dicho precepto, las causas y el procedimiento para la destitución deben proveerse por, y emanar de disposiciones de ley, estándole vedado al

---

(¹) Se ha hecho la observación de que, por lo menos en aquellas jurisdicciones en las que la admisión al ejercicio de la abogacía es un requisito para poder ser nombrado juez, el desaforo debe producir la remoción automática del cargo. Phillips and McCoy, *Conduct of Judges and Lawyers,*

Tribunal ampliarlas a su arbitrio—tampoco limitó, desde luego, la autoridad inherente de este Tribunal para disciplinar a un miembro de su propio foro, por el hecho de ser juez, por conducta impropia observada como magistrado, la cual, de haberla observado un abogado, lo expondría a una suspensión o censura.

La Asamblea Legislativa impuso como requisitos para el nombramiento de Juez Superior o de Distrito, entre otros, los de haber sido previamente admitido al ejercicio de la profesión de abogado por el Tribunal Supremo y gozar de buena reputación—secs. 12 y 17 de la Ley de la Judicatura— 4 L.P.R.A., secs. 92 y 152. Precisamente porque para ser Juez hay que ser abogado, no puede un miembro del foro escudarse en su condición de Magistrado para escapar a las consecuencias disciplinarias de una conducta que en un abogado conllevaría una suspensión o censura.[2] La Asamblea Legislativa, dándose cuenta de ello, no sólo no intentó restringir por la sección 24 la facultad de este Tribunal en su inherente función disciplinaria en cuanto a miembros de su foro, si que, por el contrario, armonizó el objetivo de sus propias disposiciones estatutarias adicionando a la penalidad de la *destitución* de un Juez, las de *suspensión* o *censura*, dando así oportunidad al Tribunal para ejercer como medidas disciplinarias de menor consecuencia contra los jueces, la autoridad que por sí mismo, en el ejercicio de su propia autoridad, puede ejercer disciplinariamente contra los abogados.

La Asamblea Legislativa no pensó en valores éticos menos exigentes para los jueces por el hecho de serlo, y en valores éticos más exigentes para los abogados, por el hecho de no serlo. Aunque en funciones distintas, los abogados son parte consustancial de nuestro sistema judicial. De ellos no

---

pág. 146, 147. Cf. *In re Burton*, 246 Pac. 188; *In re Stolen*, 214 N.W. 379; *In re Copland*, 33 N.E. 2d 857; *In re Spriggs*, 284 Pac. 521; *In re Craig*, 82 P. 2d 442; *Helwig* v. *Payne*, 241 Pac. 884; *State ex rel. Willies* v. *Monfort* 159 Pac. 889.

(2) Véase *In re Williams*, 113 S.W. 2d 353, 128 S.W. 2d 1098.

puede prescindirse. Cuando no son jueces, coadyuvan activamente en la obra de administración de justicia. Su representación en causas criminales cumple el propósito del Estado de proteger derechos ciudadanos. Cuando son jueces, realizan esa obra por sí mismos, con la colaboración de los que no lo son. Y es a los abogados a quienes acuden nuestra Constitución y la legislación vigente para formar nuestra judicatura. El ejercicio de la autoridad judicial por el Juez—que es Juez porque es abogado—no puede relevarle de las normas básicas de conducta que los valores éticos de su condición profesional le imponen. (³)

Al incluir las alternativas de *censura* o *suspensión* junto a la de *destitución* de un Juez del Tribunal de Primera Instancia como penalidades por "conducta inmoral o negligencia en el desempeño de sus deberes judiciales", la Asamblea Legislativa no limitó dichas alternativas a los casos de negligencia (*neglect*) únicamente. Así surge con absoluta claridad de la letra de la ley—sección 24—y de su historial legislativo. (⁴) Lo propio ocurre en cuanto al alcance de la frase *conducta inmoral* como causas para la imposición de cualquiera de las tres penalidades indicadas.

---

(³) La sec. 9 de la Ley de 11 de marzo de 1909, 4 L.P.R.A. sec. 735, estableció como causa de desaforo o suspensión temporal el que un abogado "fuere culpable de engaño, *conducta inmoral* (*malpractice*), delito grave (felony) o delito menos grave (misdemeanor), en conexión con el ejercicio de su profesión, o que fuere culpable de cualquier *delito que implicare depravación moral*"; disponiendo que cuando un abogado fuere convicto "de un delito grave cometido en conexión con la práctica de su profesión o que implique depravación moral, cesará, convicto que fuere, de ser abogado o de ser competente para la práctica de su profesión". (Bastardillas nuestras.) Es jurisprudencia constante de este Tribunal desde hace treinta y siete años que nuestra ley "no enumera todas las causas de separación y es tan amplia que cubre cuantos motivos justos puedan imaginarse". *In re Tormes*, 30 D.P.R. 267.

(⁴) Al explicar el alcance de la sec. 24 a que nos hemos referido, el informe del Comité que redactó el proyecto que culminó en la actual Ley de la Judicatura, y el cual informe fue acompañado, *en su texto original en inglés*, a su propio informe, por la Comisión de lo Jurídico de la Cámara de Representantes al recomendar la aprobación de dicho proyecto (P. de la C. 14) expresa, en lo pertinente, lo siguiente:

Aunque el estatuto no define la frase *conducta inmoral*, (⁵) el alcance dado a la misma—como causa de destitución, de suspensión o de censura—incluye no sólo aquella conducta que por sí misma denote tal grado de deformación moral que incapacite a un magistrado para actuar como tal, [*In re Rivera Escalera*, 75 D.P.R. 43, 57] si que también cualquier conducta impropia, censurable, incorrecta o reprensible (*wrondoing*), en relación con sus deberes como magistrado, que le haga desmerecer como tal en el concepto público; sin que sea necesario en estos casos, para imponer una pena disciplinaria que no sea la de destitución, que tal conducta obedezca a un plan, designio o fin perverso, corrompido o de malicia de un juez, pues si esto ocurriere, la deformación moral sería ostensible y la expulsión del cargo inevitable. No puede atribuirse a una Asamblea Legislativa, compuesta casi en su totalidad por casi todos los miembros de la Convención Constituyente que aprobó nuestra Constitución el 6 de febrero de 1952—precisamente en el momento en que en uso de sus poderes constitucionales, realiza una reforma completa de la estructura judicial—el propósito de condonar, no importa lo impropia o censurable, toda conducta de miembros de la judicatura que no conlleve destitución permanente, y de negar a este Tribunal, a través de una garantía de in-

---

". . . Sanctions within the power of the Court to impose are *censure*, *suspension* or *removal* from office, thus clarifying the preexisting law which seemed to be limited to *removal* or *acquittal*.

"Causes for removal or other penalty imposed by the Court on a judge *are immoral conduct* and neglect of judicial duties. The first includes *any taint of inmorality* or *wrongdoing* making the judge unfit to act or command public confidence as a judge. The second includes not only absence from court sessions or failure to perform the work of the court but also any failure to follow the high standards of judicial ethics established by professional codes which, it is expected, will be expressly adopted in substance and in spirit, for the courts of Puerto Rico." (Bastardillas nuestras.) Actas de la Cámara de Representantes, año 1951–52, pág. 400–401; 4 L.P.R.A. sec. 774 (texto en inglés).

(⁵) "El peligro de las definiciones siempre ha sido artículo de fe entre los juristas." Véase *The Dictionary Theory of Justice* en Seagle, "Law: The Science of Inefficiency" (1952) pág. 16, 23.

munidad absoluta por tal conducta, la facultad disciplinaria indispensable para mantener el respeto y la dignidad de nuestros tribunales en la más alta estimación pública.

Parece claro que si las causas fijadas en la Constitución para la *destitución* del Gobernador, del Contralor y de los Jueces del Tribunal Supremo (Art. III, Sec. 21) y la expulsión de los legisladores (Art. III, Sec. 9), han de tomarse como expresión de voluntad para restringir al legislador en el uso de la facultad delegádale por la Constitución para fijar las causas de *destitución* de los jueces de los demás tribunales, o como norma para determinar el alcance de la frase *conducta inmoral* usada por el legislador en el estatuto, (6) tendríamos que reescribir la sec. 24 para eliminar de ella la negligencia (*neglect*) como causa de *destitución*, porque no habría razón para que la norma de resguardo a la independencia de la función judicial, como ejercicio de la autoridad política, fuera distinta para unos que para otros.

Si el pensamiento del pueblo es producto de los valores éticos prevalescientes en nuestra sociedad al tiempo de aprobarse la Constitución, debemos enfrentarnos a la siguiente alternativa: o no consideró la Convención Constituyente que negligencia (*neglect*) en el desempeño de funciones judiciales representaba transgresión de valores éticos, o definitivamente hizo sólo expresión de aquellos cuya transgresión debían ser causa de destitución, de acuerdo con la jerarquía de los funcionarios a quienes la aplicaba, dentro de la estructura del estado político que creaba. Si lo primero, habría que concluir que la Asamblea Legislativa, contrario a la tradición y a la delegación expresa de poder en la Sección 11

---

(6) Para aceptar esta fórmula de interpretación habría que concluir además, que las personas que aprobaron la ley—que fueron prácticamente las mismas que aprobaron la Constitución—incurrieron en la inadvertencia de utilizar términos distintos para reglamentar los mismos actos. Como ambos cuerpos de ley fueron objeto de detenido estudio y reflexión serena y comenzaron a regir simultáneamente, no puede menos que concluirse que el propósito de utilizar términos distintos fue el de establecer diferencias de contenido.

del Artículo V, no podía agregar otras causas que no fueran las que el pueblo señaló para que cesaran en el ejercicio de su autoridad, el Gobernador, el Contralor, los Jueces del Tribunal Supremo y los Legisladores. Si lo segundo, precisa inexorablemente ir a la ley y a su historial legislativo. En ese sentido, la Asamblea Legislativa dispuso que tanto dicha conducta como la de negligencia (*neglect*) podían ser causa de destitución, suspensión o censura. Si, como subraya el informe del Comité que redactó la Ley de la Judicatura, negligencia (*neglect*) incluye no sólo dejar de hacer la labor, sí que también el no seguir las altas normas de la ética judicial, podríamos en último extremo estar ante transgresiones caracterizadas de modo distinto y con distinto énfasis, pero siempre de contenido ético; y ciertamente nunca ante un vacío de la ley para poder sancionar conducta que se admite que es altamente impropia de un magistrado, aunque no acuse deformación moral.(⁷)

El concepto ético de la conducta judicial, que forma parte inherente de toda judicatura, no puede hacerse depender de la existencia o no de un código escrito. Si al autorizar la sec. 24 de la ley la suspensión o censura de un Juez, sólo se refiriera a la negligencia (*neglect*) de un magistrado en el desempeño de sus deberes judiciales, y a este término se le da el contenido ético que se ha apuntado, no vemos cómo conducta impropia de un juez, por el hecho de no acusar depravación o deformación moral, pueda dejar de ser base para alguna sanción que no conlleve destitución, cuando la conducta observada ha transgredido el sentido ético de la norma. Difícilmente puede alzarse sobre su propio prestigio una ju-

---

(⁷) Es de notar que la Ley núm. 58 de 29 de abril de 1930, señalaba como causas de *destitución* de los Jueces de Distrito (hoy Superiores), la "conducta inmoral" además de la "prevaricación" y de "cualquier delito que implique *depravación moral*". (Bastardillas nuestras.) De ello es inevitable concluir que el término "conducta inmoral" tenía ya un contenido más amplio que el de "prevaricación" o "depravación moral". De lo contrario su uso en la ley de 1930 hubiera resultado superfluo.

dicatura protegida por un manto de inmunidad contra suspensiones o censuras por conducta impropia que no implique depravación moral, si la conducta en sí, independientemente de la caracterización que de ella se haga, deja a la imaginación pública la medida de sanción que debió imponerse.

No se devuelve a la judicatura, convicto como delincuente moral, al magistrado que reasume sus deberes tras una suspensión o censura por actuaciones que no denotan depravación o deformación moral, pero que son "altamente impropias y lesivas al prestigio, la dignidad y el buen nombre de nuestros tribunales" y constituyen "conducta incompatible con la que debe seguir un hombre a quien se le encomienda la misión de administrar justicia". El proceso es uno de justo balance en la depuración de valores que pertenecen a la fe pública. Porque más lesionada quedaría la judicatura y más se deterioraría la confianza del pueblo en los tribunales si se desarrollara la creencia de que conducta de esa naturaleza forma parte autorizada de la función judicial y de que un magistrado incurso en ella ha de continuar su ministerio sin recibir de este Tribunal la sanción formal que las circunstancias justifiquen.

Como todo ejercicio de autoridad, ya sea legislativa, ejecutiva o judicial, representa un ejercicio de poder político delegado por el pueblo, no puede establecerse diferencia entre el ejercicio del poder judicial que ejerce este Tribunal cuando conoce en primera instancia de recursos y causas que se determinan por ley, conforme a la Sección 5 del Artículo V de nuestra Constitución, y el ejercicio del poder judicial que ejerce cuando conoce de procedimientos de destitución de jueces de los demás tribunales conforme a la Sección 11 del propio Artículo V. En ambos casos ejerce poder político y en ambos casos ejerce función judicial. Tanto la Asamblea Legislativa al conocer de procesos de residencia según lo establece la Sección 21 del Artículo III de la Constitución —aplicable a los jueces del Tribunal Supremo en virtud de la

Sección 11 del Artículo V ya citado—como este Tribunal cuando conoce de procesos de destitución de jueces de los demás tribunales, ejercen también poder político. En el primer caso las causas y el procedimiento los fijó taxativamente la Constitución. En el segundo, la Constitución dejó la determinación de las causas y el procedimiento a la Asamblea Legislativa, que ejerció su autoridad en la forma y manera que hemos expresado.

El criterio que sustento en cuanto a la facultad de este Tribunal, conforme a la sec. 24 de la Ley de la Judicatura para suspender a un Juez de Primera Instancia de su cargo por conducta impropia que no deba conllevar una destitución, no se funda en una calidad superior de poder, ni en una división de alcurnias del Poder Judicial—que es uno solo. (Art. V, Sec. 1 de la Constitución). No se funda tampoco en la existencia en sí de categorías de tribunales, condición que es indispensable en todo sistema judicial ordenado. No puede constituir limitación alguna a la autoridad política que encarnan y ejercen dichos magistrados—que desde luego no les llega por delegación del Tribunal Supremo—el hecho de que este Tribunal ejerza facultad, derivada de la ley, **para** suspender o censurar a un juez por conducta impropia que no conlleve destitución.

El poder para crear y suprimir tribunales, con excepción del Tribunal Supremo, y determinar su competencia y organización, dentro de los propios límites constitucionales, corresponde a la Asamblea Legislativa. Una cosa es la igualdad de origen del poder judicial, en términos de poder político delegado, y otra las limitaciones específicas impuestas en su ejercicio por la Constitución y por la ley a los distintos tribunales que integran el sistema judicial. Y claro está, una cosa es el ejercicio del poder judicial y otra la conducta de los jueces que lo integran. Las garantías constitucionales de independencia judicial presuponen un ejercicio digno, ponderado y discreto de ese poder. Mientras la Judicatura, por

sus propios actos, se mantenga al nivel de dignidad que el pueblo de ella espera, no cabe en los jueces temor ni desasosiego. El desasosiego y el temor cabrían en el pueblo mismo, si la protección a los jueces en la incumbencia de sus cargos—que ciertamente forma parte del conjunto de garantías indispensables para una judicatura independiente —redujera los niveles éticos de la conducta judicial. Ni el pueblo, a través de su Convención Constituyente, ni la Asamblea Legislativa, a través de la Ley de la Judicatura, han auspiciado la transgresión de normas de conducta judicial so pretexto de proteger la integridad de ejercicio de poder político, ni han condenado esa conducta. En ninguna comunidad civilizada, y ciertamente tampoco en la nuestra, prevalece esa escala de valores.

## II

Estimo que el primer cargo, relativo al incidente en Sala el viernes 3 de mayo de 1957, quedó suficientemente establecido por la prueba.

El querellado, a quien competía, por su condición de Juez, mantener el orden de su Sala, conservando en sereno equilibrio sus propias reacciones personales, transgredió la solemnidad del recinto al dar rienda suelta a sus ímpetus, interrumpiendo la sesión del tribunal con un súbito receso para bajar en actitud violenta de su altísima curul de Magistrado a enfrentarse al reto del abogado. *"Yo no podía permitir* que él [el abogado] me dijera que me estaba aprovechando de eso [de que era Juez] *como que le fuera a coger miedo; por eso dí receso y bajé a ver si me mataba.* Yo no tenía nada encima" (bastardillas nuestras) son palabras del propio querellado que apuntan directamente a la gravedad de su actuación.[8] (Exh. 15 del Querellante, pág. 49). Es con-

[8] El querellado explica así su actuación:
*Exh. 15 del Querellante*, pág. 16: ". . . como yo sé que él quería aparecer ante el público como si los funcionarios le tuvieran miedo y yo todavía no le tengo miedo a nadie, bajé. 'Receso' y bajé de estrado. Yo no

'ducta impropia de un Juez contribuir activamente al menosprecio que para la dignidad y prestigio de los tribunales significa convertir una sala de justicia en arena de combate, y usar lenguaje indigno de su cultura y posición, sin que obste para ello que a la alteración del orden, a las actitudes violentas y a las frases altisonantes o de mal gusto, les precediera un receso en los procedimientos judiciales—que aquí se produjo precisamente por la decisión del magistrado de demostrar su valor en el terreno personal—o que el epíteto lanzado al alcance de las personas que se hallaban presentes, lo usara como adjetivo, en sentido figurado, para calificar de cobarde o pusilánime al abogado. La impropiedad de su uso, que no puede justificarse como cuestión de semántica, estriba en que en nuestro medio está proscrito como voz usual por las buenas costumbres. En el lugar y bajo las circunstancias en que fue usado, sin dejar de ser imputación de menosprecio al valor personal del abogado, se convirtió en ofensa a la propia dignidad del Tribunal.

Las salas de justicia son recintos solemnes donde la función del abogado, aún en la gran libertad de defensa que el descargue de su seria responsabilidad de abogar conlleva, no significa inmunidad para envolver en sospechas infundadas la personalidad del Juez que preside, ni donde la serena actitud del juzgador deba trastocarse en un momento de enfado, en menoscabo de la alta dignidad que representa.

---

pensaba ir a pelear con él, allí alguien me aguantó; hubo quienes nos aguantaban . . ."
*Record, pág. 1108:* ". . . yo decidí dar un receso para calmar mis nervios y dí el receso y bajé."
*Record, pág. 1109:* ". . . Yo no iba a pelear. Yo iba con la idea de irme a mi oficina, tomarme una pastilla de equanil, calmarme mis nervios y después decirle a dos o tres compañeros que buscaran al licenciado César Andréu Ribas para que me diera una explicación."
*Record, pág. 1111:* "Yo realmente estaba enfadado, pero no estaba iracundo ni violento; y precisamente porque estaba enfadado y quería quitarme el enfado de dentro del cuerpo, dí el receso para ir a la oficina y tomarme un equanil, como me la tomé".

Abogados y jueces, más que cualesquiera otros ciudadanos, tienen la obligación de velar porque los tribunales no sufran en el concepto público, observando la debida compostura a través de los procedimientos judiciales y evitando que un deterioro de relaciones personales, (⁹) indeseable de por sí, pueda conducir al quebrantamiento de las normas de conducta que de ellos se espera. Ciertamente al juez corresponde, como depositario de la autoridad judicial, mantener el orden y la dignidad de su sala, tanto por la austeridad, mesura y firmeza que a sus actuaciones en estrados imprima, como por el uso coactivo del poder que se le confiere, si fuere preciso. Y si la conducta de un abogado conllevare ataques injustifi-

---

(⁹) El 15 de abril de 1953, al emitir la opinión del Tribunal en un caso cuyos hechos en nada se relacionan con el presente, *Cordero* v. *Rivera,* 74 D.P.R. 586, 608, hice justo reconocimiento al juez sentenciador en el mismo—que es el juez aquí querellado—cuyas actuaciones fueron impugnadas con vehemencia por uno de los abogados en dicho caso—que no es el abogado envuelto en este procedimiento—en la siguiente forma:

"Declarando con lugar el tercer señalamiento en aquella parte por la que se le atribuye error en la apreciación de la prueba, precisa—en merecida justicia al juez sentenciador—rechazarlo en aquella parte por la que se le imputa haber actuado 'con mente prevenida y con pasión y prejuicio'. Dicha imputación no está justificada. Lejos de ello, el juez sentenciador actuó con mesura y fue escrupuloso en extremo. Ello precisamente porque tal actitud, que constituye norma deseable de actitud judicial en todo caso, en éste se hacía imperativa, porque aquí, como en otros casos de su representación profesional, el abogado de los demandados había solicitado la inhibición del Juez, por el fundamento de ser 'enemigo personal irreconciliable' suyo, cuestión ésta que ya anteriormente se había ventilado ante un juez especial, siendo desestimada."

Y en opinión separada propia, en ese mismo caso, en ánimo de mejorar las relaciones personales entre abogado y magistrado, expresé los siguientes conceptos que hoy podría repetir:

"Deseo agregar ahora, separadamente de la opinión del Tribunal, estas palabras mías: entre la nobleza del caballero hidalgo que hay en el abogado . . . —hombre honorable, de vida limpia y honradez acrisolada— y la hidalguía del caballero noble que hay en el Juez Fernando Gallardo Díaz—magistrado justo, de mente alerta y de conciencia honrada—no puede haber distancias. Los hombres nobles se unen en la comunión de sus almas grandes: los abismos sólo existen para los hombres de espíritu pequeño. Una mano tendida a tiempo salva las distancias que no deben existir."

cados a su honestidad y rectitud como Magistrado, ($^{10}$) foro hay al cual recurrir para exigir responsabilidad por esa conducta, y hará crecer más el Magistrado la dignidad de su Sala y la suya propia, si dándose cuenta de la majestad que ostenta, reprime sus ímpetus airados para no poner en riesgo, en el calor de su indignación como hombre, el símbolo que representa como Juez.

### III

Bajo los hechos que el Tribunal ha estimado probados en cuanto al segundo cargo—que representan la versión más favorable al querellado—su conducta fue también impropia:

1. Porque teniendo la carta de 6 de mayo de 1957 el evidente propósito de desmentir la información publicada en la edición del periódico El Imparcial de ese mismo día, el

---

($^{10}$) En ocasión de la inauguración del edificio destinado a alojar las Salas de Bayamón del Tribunal Superior y el de Distrito, llamado a pronunciar unas palabras, me referí al aquí querellado en la siguiente forma:

"Yo debo decir que la justicia es la expresión más alta de la humanización del derecho que tiene indudablemente, que tiene indiscutiblemente un exponente elocuente en el juez que preside esta Sala de este Tribunal Superior, Fernando Gallardo Díaz. Si alguna falta, que todos tenemos, tiene Fernando Gallardo Díaz es sentir en toda la emoción del alma las tragedias humanas que se presentan a los Tribunales de Justicia a través de un árido recurso judicial, donde se asoman las ideas, a veces a medias, porque no se puede entrar en toda la amplitud de esos problemas. Ese árido recurso judicial sólo ofrece una pequeña ventana a través de la cual mirar hacia la vida. Esa es, a mi juicio, una de las grandes virtudes de Fernando Gallardo Díaz. Puede ser explosivo en el alma y en sus emociones y a veces puede cometer errores judiciales, precisamente llevado por la explosión que en su alma producen esas grandes tragedias de la vida y se acercan a los problemas del individuo en toda su expresión básica de unidad.

Que este templo, que hoy se abre para recibir todo ese fardo de problemas que acuden en forma de recursos judiciales a los tribunales, tengo la convicción de que ha de ser presidido por los hombres que están llamados a realizar su labor aquí, justo templo para toda expresión máxima de la justicia que este gran pueblo nuestro necesita y encarna y con orgullo habrá de proclamar a todos los vientos para que se le oiga, para que se le mire, para que se le siga y para que se le envidie en su grandeza de espíritu, en su gran obra de justicia." (Exh. 15 del Querellante, págs. 5 y 6)

querellado, quien "tenía interés en que se rectificara una noticia falsa", pág. 1227 Record, y quien era por lo tanto, la parte favorecida por la misma tanto en su contenido como en su forma de expresión, le dio publicidad, a nombre del Tribunal, ([11]) leyéndola en corte y llevándola a sus propias actas, con la consecuencia de perpetuarla en un record judicial y revestirla de la solemnidad de las actuaciones judiciales, sin que en ese momento hiciera público también el origen de dicha comunicación y el hecho de que la había redactado el propio querellado—aún cuando a solicitud del corresponsal del periódico—y constándole al querellado que éste no había presenciado el incidente del viernes 3 de mayo, sin aclarar los términos ambiguos de dicha comunicación sobre este extremo, de los cuales era fácil derivar una impresión contraria.

2. Porque al llevar dicha carta a las actas del tribunal en la sesión del lunes 6 de mayo, dio perpetuidad a un hecho que, aún cuando suscrito por el corresponsal del periódico en una post-data agregada a petición de éste por el taquígrafo Amaral, era un hecho falso cuya falsedad le constaba al querellado, quien permitió que dicho taquígrafo así lo consignara en la post-data: el hecho de que el corresponsal le había dictado dicha carta al referido taquígrafo, y que por eso la misma iba escrita en maquinilla. ([12])

([11]) El querellado explica así el por qué quiso hacer constar en las actas de la sesión del lunes 6 de mayo sus manifestaciones, desde estrados, sobre la información de El Imparcial de ese mismo día (pág. 1133 Record):

"P.   Quiero referirme a esto que se dice aquí que usted anunció desde estrados lo siguiente: 'La corte quiere hacer constar, para que aparezca en las actas, que en el periódico El Imparcial aparece una información que es un desdoro, si fuera cierta, para este tribunal'. ¿Por qué razón dijo usted eso en estrados?"

"R.   En esa época había mucho jurado, estaba lleno de jurados.   En ese mismo día o el día anterior apareció un periódico diciendo que yo había desafiado y había armado un escándalo.   Una falsedad.   Y yo quería, a la gente que me conoce en Bayamón, al jurado que trabaja conmigo, a los ciudadanos de Bayamón, darle la versión de la verdad".

([12]) El incidente de la post-data la explica el querellado en la siguiente. forma:   (Págs. 1224–1225 Record)

"P.   ¿Pidió él que se agregara algo más?

3. Porque utilizó su propio Foro y la solemnidad del recinto judicial para usar *ex parte*, y sin estar presente el abogado a quien evidentemente se refería, ([13]) lenguaje impropio de un magistrado y atentatorio a la dignidad de los tribunales, al manifestarse, inmediatamente antes de dar lectura a la carta de referencia, en la siguiente forma:

"Queremos hacer constar estas manifestaciones, porque el que lee 'El Imparcial' cree que aquí el que presidió el tribunal es un *ganster*, y yo no he sido *ganster*, ni semejante a *ganster*, ni he sido abogado *ganster*, ni nunca he estado asociado con *gansters*. Por el contrario me torno orgulloso de cuando era fiscal de Guayama y fiscal de San Juan.

"R. No, no pidió.
"P. ¿No pidió nada más?
"R. Lo que pidió fue que le pusiera una 'post-data'. El dijo 'el licenciado sabe que no sé escribir en maquinilla, hágame el favor, mande a Amaral para que me le ponga una "post-data" diciendo que yo se la había dictado a él.'
"P. ¿Pero usted sabía que eso no era cierto?
"R. Yo sabía que no era cierto. Y le dije: 'Bueno, eso es una cosa tuya.'
"P. ¿Ud. sabía que el señor Santini no había dictado la carta, que la había dictado usted?
"R. Seguro que sí. Pero eso era una cosa de él.
"P. ¿Pero usted fue el que instruyó al taquígrafo para que pusiera la 'post-data'?
"R. Yo no se lo instruí, se lo instruyó el señor Santini.
"P. ¿Pero usted llamó al taquígrafo?
"R. Yo llamé al taquígrafo que quería el señor Santini para que le pusiera esa 'post-data'. Pero eso fue una cosa que salió del señor Santini y yo se lo advertí: 'Eso es una cosa tuya'. Pero el quería que se lo pusiera.
"P. ¿Compañero, usted era el magistrado de Bayamón y usted estaba en su oficina de juez del Tribunal Superior de Bayamón e hizo llamar al taquígrafo reporter del· tribunal para poner una 'post-data' que usted sabía que era falsa?
"R. Bueno, la falsedad no era mía. La falsedad de él.
"P. Pero usted consintió . . .
"R. Y eso era una falsedad que yo no tenía que consentir o no, eso era una cosa volitiva del señor Santini, era una cosa de su pensamiento, de su propia acción, de su propia voluntad que quería ponerle eso. Por eso mismo le dije: 'Eso es una cosa tuya.' "
([13]) *Exh. 15 del Querellante, pág. 24:*
"¿En algún momento después del incidente bajó hasta el automóvil de César Andréu Ribas?

"Claro que la información que dió el periódico, que da el periódico en la forma que está expuesta, si parece que aparece que fué inspirada por un asociado de *gansters,* porque esas son las cosas que producen la gente de esta categoría". *Exh. 14 del Querellante.*

## IV

Fundado en el criterio ya expuesto sobre el alcance de la ley y las actuaciones del querellado, estimé que procedía declarar con lugar la querella en tanto los cargos imputaban a aquél conducta impropia de un magistrado en el curso de, y con relación a procedimientos judiciales, conducta ésta que no acusa en el querellado deformación moral que le incapacite permanentemente para el ejercicio de su ministerio y haga imperativa su destitución, pero que evidencia una actitud altamente impropia y de menosprecio y lesión a la dignidad del cargo, que justificaba, a mi juicio, una suspensión por seis meses, como medida disciplinaria.

Opinión del Juez Asociado Sr. Hernández Matos en la cual concurre el Juez Asociado Sr. Santana Becerra.

San Juan, Puerto Rico, a 12 de marzo de 1959

El primer cargo gira alrededor de la conducta del querellado en el incidente del viernes 3 de mayo de 1957 a que

---

"Después que había pasado todo, *como sé que siempre anda con matones y con gente que ha defendido por Asesinato* y cosas de esas, dije: 'Estoy desarmado aquí ahora.' *Pensé que hubiera algún matón de éstos que él viene, con varios;* bajé abajo a buscar al 'dash' de mi automóvil el revólver; no llegué al carro, me arrepentí; bajé la escalera hasta el escalón que llega a la Corte Municipal; formé la idea que seguiría la cosa como estaba; volví y seguí la sesión." (Bastardillas nuestras.)

*Record, pág. 1196:*

"P. ¿Por qué usted pensó que debía ir a buscar su revólver al automóvil?

"R. Bueno, yo pensé eso *porque yo sé que el compañero Andréu siempre anda con alguna gente no muy católica en cuestión de bravura.*

"P. Repita qué usted quiere decir con 'gente no muy católica en cuestión de bravura'.

"R. Bueno, de esa gente que . . . *guardaespaldas que le llaman aquí."* (Bastardillas nuestras.)

se refieren las Conclusiones de Hecho núms. 8, 9, 10 y 11. El Secretario de Justicia de Puerto Rico, por sí y representado por los fiscales especiales generales señores Aponte y Gil, sostiene: que en el curso de dicho incidente el querellado observó una conducta inmoral e impropia de un magistrado, haciendo uso de lenguaje obsceno y ofensivo, en alta voz, que dio lugar a que se promoviera el correspondiente desorden y se interrumpieran los procedimientos y a que intervinieran varios abogados y funcionarios para evitar agresiones físicas entre él y el abogado Andréu Ribas; que el querellado "hirió en lo más profundo el prestigio, la dignidad y el buen nombre de nuestros tribunales de justicia." Cargo núm. Uno y Alegato del Querellante, pág. 7.

En su defensa alega, en síntesis, el querellado: que para justificarse la censura, suspensión o destitución de un juez un solo acto no es suficiente, debiendo demostrarse una continuidad de actos irregulares o ilegales; que su conducta estuvo justificada por la imputación que le hizo el abogado; que tal conducta fue una reacción mental razonable al leer, por "primera vez" la moción; que ese escrito fue el origen de todo el problema; que fue retado por el abogado; que el vocablo que usó, fuera de estrados, es palabra de mal gusto, vulgar y nada más, que significa cobarde o pusilánime; que no se promovió desorden alguno; que el testigo principal en su contra, Andréu Ribas, incurrió en "26 falsedades" y por tanto toda su declaración es falsa, por todo lo cual la conducta observada por él no puede caracterizarse de inmoral. Alegato del Querellante, págs. 5–16.

La actuación del juez querellado (que surge de los hechos que contienen nuestras Conclusiones de Hecho núms. 9, 10 y 11) constituye conducta incompatible con la que debe seguir un hombre a quien se le encomienda la misión de administrar justicia. El uso de lenguaje desafiante, al alcance de funcionarios del tribunal, de numerosos abogados, litigantes y de un público formado por mujeres y niños, el manotazo

sobre su escritorio, su disposición a tener en plena sala de sesiones un encuentro personal con el abogado, la situación de perturbación del orden y del ambiente de serenidad en los procedimientos judiciales que a ello siguió, el espectáculo del juez agarrado por sus brazos y empujado hacia los pasillos por el alguacil y varios abogados para evitar un encuentro físico entre magistrado y abogado, y la suspensión, por largo rato, de toda labor judicial, sin duda alguna constituyen actuaciones altamente impropias y lesivas al prestigio, la dignidad y el buen nombre de nuestros tribunales de justicia.

Bajo las circunstancias de este caso, no consideramos aceptables las excusas que aduce el querellado para justificar su conducta. No sería sana y confiable la norma de que un solo acto irregular o ilegal, cualquiera que fuere, es siempre y en todo caso, insuficiente para el ejercicio de nuestra jurisdicción disciplinaria. (1) En *In re Dávila Reyes*, 79 D.P.R. 816, (1957), se destituyó permanentemente al juez allí querellado por la comisión de un solo acto ilegal no obstante haberse decretado su absolución por un jurado en causa criminal por el mismo acto ilegal. Cf. 48 C.J.S. *Judges*, sec. 27, pág. 976.

¿Estuvo justificada la conducta del juez por la imputación que le hizo el abogado Andréu Ribas en su moción solicitando enmiendas a la transcripción? Es cierto que la seria imputación que el abogado le hizo en su moción fue injustificada;

---

(1) Lo resuelto en *Pérez* v. *Meraux*, 195 La. 987, 197 So. 683, (1942), que cita el querellado, es que cuando un acto aislado de un juez, al decretar una sentencia, constituye un error de juicio o de criterio, el mismo no es bastante para su remoción. Manresa, en el tomo 2 de su obra "Comentarios a la Ley de Enjuiciamiento Civil", págs. 484, 485, ed. séptima, 1953, divide en judiciales y gubernativas las faltas de los jueces que, según la Ley Orgánica del Poder Judicial y la Ley de Enjuiciamiento Civil españolas pueden dar lugar a la imposición de correcciones disciplinarias. Las primeras se refieren directa e inmediatamente al procedimiento, tanto que han de consistir en la infracción de algún precepto de la ley procesal. Las segundas se refieren a la disciplina y decoro de los funcionarios y al buen gobierno de la corporación llamada tribunal, sin relación directa e inmediata con el procedimiento.

también es cierto que, durante su vista, ninguna excusa o explicación del abogado recibió el juez agraviado, limitándose aquél a reconocer que la omisión fue involuntaria por parte del taquígrafo y que éste era un funcionario correcto y honesto.

Empero, la falta cometida entonces por dicho abogado al no ofrecer al tribunal, en corte abierta, la debida explicación que eliminara toda sospecha de intervención del querellado en la omisión en que había incurrido el taquígrafo Amaral, y aun su comportamiento impropio en sala de dirigirse al público y no al tribunal cuando hablaba—R. 899, 900—demandaban del querellado la conservación de su compostura de magistrado y el que hiciera uso de la autoridad, medios y recursos que la ley y el poder inherente en todo tribunal conceden para mantener el orden, su prestigio y dignidad.

Si el querellado conocía en parte la moción antes de la vista, si consideraba al abogado como su enemigo implacable, si sabía que "siempre anda con una pistola al cinto" y que allí tenía "un gran revólver", que "siempre anda con matones y con gente que ha defendido por Asesinato y esas cosas", que "no respeta a los tribunales", que "ha maltratado más de un juez", que "cada vez que ha tenido una oportunidad, me ha buscado la manera de mortificarme", y si él creía que "el Lcdo. César Andréu Ribas ha llegado a creer que los jueces le tenemos miedo y que a base de pantalones es que se han de resolver esos casos",—R. 401; Exh. 15, Querellante, págs. 7, 12, 13 y 17—en ese momento la delicada situación no podía sortearse en la forma imprudente en que lo hizo el querellado. Estaba obligado a contenerse dentro de su propio círculo de deberes como magistrado, a reprimir sus reacciones mentales que le impulsaran a convertir el augusto recinto de una sala de justicia en arena para un encuentro personal.

El vocablo que usó el querellado cuando ya había entrado al pequeño pasillo, no es obsceno per se. —Véanse: la defini-

ción de "pendango" que ofrece el "Vocabulario de Puerto Rico" de Augusto Malaret; las que dan del vocablo en cuestión el Diccionario de la Lengua Española, ed. 1956, el Diccionario Vox de Publicaciones Spes, ed. 2da., el Diccionario Enciclopédico Hispano Americano y el Diccionario Ideológico de J. Cásares.—Lo usó como adjetivo, en sentido figurado, para calificar de cobarde o pusilánime al abogado.([2]) Pero el tono de voz en que lo dijo fue lo suficientemente fuerte para que fuera oído por todos los que quedaban en el salón de sesiones. En aquellos momentos, y aun aceptando que el querellado hiciera uso del vocablo para lograr que dejaran de sujetarlo, la expresión se convirtió en una imputación imprudente de cobardía o pusilanimidad que provocó una recíproca e igual imputación por parte del abogado en plena sala del tribunal y que pudo haber tenido consecuencias lamentables.

Como admite el querellado, en Puerto Rico la palabra es de mal gusto y vulgar. Su uso es impropio e incorrecto entre personas educadas, y con mayor razón en o cerca de una sala de justicia.([3])

Ahora bien, a pesar de que no aprobamos el comportamiento del juez querellado durante el incidente del viernes

---

([2]) En su declaración ante los fiscales, prestada el 14 de mayo de 1957, declaró, entre otras cosas, el querellado: ". . . y, lo que dije que era un pendejo y dondequiera que estemos lo digo porque el hombre que hace lo que hizo conmigo creo que es un pendejo; con un gran revólver sabiendo que estaba desarmado. Mi revólver estaba en el 'dash' de mi automóvil." Exh. 15, Querellante, págs. 23 y 24. "Lo que pasa que cuando César Andréu Ribas me vio bajar se puso más blanco que la leche. Es más, que busca insultar la gente y sacarle el cuerpo después." Pág. 25, Id.

([3]) El Canon IV de los Cánones de Ética Judicial que aprobamos el 24 de septiembre de 1957, en su párrafo primero dice:

"El Juez debe dirigir los trabajos del Tribunal con orden y decoro y estar alerta contra todo proceder que pueda afectar la dignidad y el respeto debidos al Tribunal. Debe impedir toda conducta impropia de abogados, fiscales u otros funcionarios del Tribunal, así como de cualquiera otra persona presente. En el curso de los procedimientos judiciales, su actitud general, sus manifestaciones y el tono de su voz deben mantenerse dentro de la debida propiedad y circunspección. Al actuar para mantener la dignidad y funcionamiento eficiente del Tribunal, la actitud del Magistrado no deberá mostrar impaciencia o severidad excesivas."

3 de mayo de 1957, consideramos, tomando en cuenta todas las circunstancias concurrentes, que el mismo no constituye la conducta inmoral que contempla la ley como base suficiente para destituir a un magistrado.

"Conducta inmoral" ha sido definida como aquella que es voluntaria, flagrante o poco pundonorosa y que revela indiferencia moral ante el criterio de ciudadanos respetables de la comunidad. *In re Rivera Escalera*, 75 D.P.R. 43, 57 (1953).([4])   Debe ser de tal naturaleza que incapacite al juez para actuar como tal y merecer la confianza pública.([5])

El uso de lenguaje de mal gusto, las destemplanzas e irregularidades menores, cuando ocurren en ocasiones aisladas, se han considerado insuficientes para imponer sanciones disciplinarias a los jueces. *In re Bridges*, 225 N.Y.S. 226 (1927); *In re Snitken*, 146 N.Y.S. 560 (1914).   Como expresó la opinión disidente en *In re Hirshfield*, 241 N.Y.S. 601 (1930): "Dada la naturaleza de los servicios [judiciales] no debe esperarse que algunos de los que los prestan no sean susceptibles, de tiempo en tiempo, de cometer faltas y dar muestras de irritabilidad."

---

([4]) En *Warkentin* v. *Kleinwachter*, 27 P.2d 160, 163 (1933), resuelto por la Corte Suprema de Oklahoma, se dijo:

"The words 'morality' and 'character' may have the same meaning when standing alone, but when used together the word 'moral' defines the kind of character required by the rule.   When so used the word 'moral' is in contradistinction to the word 'immoral.'   With reference to the word as used in the rule, this court in *Re Hicks*, 163 Okl. 29, 20 P. (2d) 896, 897, said: 'Webster defines immorality as a state or quality of being immoral; vice; wickedness; specif., unchastity; also, an immoral act or practice; a vice. '*Immoral*,' *as defined in the Standard Dictionary, is hostile to welfare of the general public;* and Bouvier defines '*immorality*' *to be that which is contra bonos mores*.   In *Moore* v. *Strickling*, 46 W. Va. 515, 33 S.E. 274, 50 L.R.A. 279, *it was held, in substance, that that conduct which is willful, flagrant, or shameless, and which shows a moral indifference to the opinions of the good and respectable members of the community, is immoral conduct*."   (Bastardillas nuestras.)

([5]) Véase la parte correspondiente del Informe del Comité que redactó el proyecto de la Ley de la Judicatura de 1952, transcrita como parte del historial de la sec. 232 del Título 4 L.P.R.A.

Cuando existe continuidad, hábito o costumbre en el uso de lenguaje de mal gusto, ofensivo o escandaloso, en la comisión voluntaria de destemplanzas, de irregularidades serias en su conducta moral o de vicios que lo hacen desmerecer en el concepto público y que comprometen el decoro de su ministerio, el magistrado incurre en delincuencia moral que lo somete a nuestra jurisdicción disciplinaria que ejercemos como medio de hacer respetar y obedecer el orden judicial, de conservar la disciplina y de que cada cual llene cumplidamente sus respectivos deberes.

No podemos caracterizar como conducta inmoral que exija inmediato procesamiento del magistrado, cualquier falta aislada, ocasional o esporádica, que no tenga un enlace ostensible con algún fin o plan perverso, corrompido e inmoral.

Es un hecho evidente y afortunado que desde su reorganización original en 1904 hasta el presente la magistratura puertorriqueña ha estado servida por jueces de firme carácter e integridad moral. Hasta el año 1930 no existió estatuto específico alguno señalando causas y prescribiendo el procedimiento para la destitución de jueces. En 54 años solamente han sido disciplinados tres jueces que no pudieron concebir la grandeza de su misión o que, pudiendo concebirla, no tuvieron dentro de sí la fuerza moral bastante para ponerse a su altura. En el primero de ellos, por voz del ilustre Sr. Del Toro, dijimos:

"La obra de jueces competentes, diligentes y morales es absolutamente necesaria en las cortes de distrito para que la judicatura conserve su prestigio, inspire confianza y realice su misión, para administrar justicia a todos por igual con prontitud y acierto."

La primera ley que estableció el procedimiento para destitución de jueces de distrito fue la núm. 58 de 1930. En ella se señalaron como causas para la destitución: prevaricación, soborno, conducta inmoral, cualquier delito que im-

plicara depravación moral, negligencia inexcusable o ineptitud manifiesta para el desempeño de sus funciones. La Ley Orgánica de la Judicatura de Puerto Rico, aprobada el 15 de mayo de 1950 adoptó las mismas causas y el mismo procedimiento para la destitución de jueces. Esa conducta inmoral obviamente tenía que ser grave por naturaleza al igual que las demás causas allí señaladas.

Al reorganizarse finalmente nuestro sistema judicial por la Ley núm. 11 de 24 de julio de 1952, a través de su sec. 24 se instrumentó la disposición contenida en la Sección 11 del Art. V de nuestra Constitución relativa a la destitución de jueces superiores, de distrito y de paz. Como causas para la destitución se señalaron conducta inmoral o negligencia en sus deberes oficiales. Es obvio que dentro de la frase "conducta inmoral" está incluída la comisión de todo delito grave y cualquier otro que implique depravación moral,— Cf. *In re Abella*, 67 D.P.R. 229, 239 (1947)—así como toda clase de conducta inmoral, que aun sin llegar a constituir delito público, sea "voluntaria, flagrante o poco pundonorosa y que revele indiferencia moral ante el criterio de ciudadanos respetables de la comunidad." [6]

Volviendo al caso de autos, nos damos cuenta de que la conducta del querellado durante el incidente no lo incapacitó para seguir actuando como juez en el resto de la mañana del 3 de mayo. Momentos después del incidente recobró su tran-

---

[6] A pesar de que la disposición constitucional claramente se refiere a la *destitución* de jueces, la Legislatura facultó a este Tribunal Supremo, adicionalmente, para poder censurar o suspender al juez. Bajo la legislación anterior el resultado final estaba limitado a una destitución o a una absolución. Si absuelto, el juez seguía ocupando su cargo como si jamás hubiera sido procesado. Si declarado culpable, sólo procedía su destitución y dejaba de formar parte de la judicatura. Bajo el actual sistema puede crearse la situación anómala de estar presidiendo un tribunal un juez declarado delincuente moral pero al cual solamente se le ha castigado con una censura o con una pequeña suspensión. Si a la Legislatura se le concedió por la Constitución poder para prescribir otras penalidades en adición a la destitución, es cuestión que no está ante nos.

quilidad, la serenidad de espíritu, su sentido de ecuanimidad y procedió a continuàr y continuó las labores judiciales del tribunal, dentro del mayor orden y compostura, celebrando las vistas de los otros cuarenta casos señalados en el calendario de ese día. Su disposición personal original en torno al incidente fue la de no darle publicidad alguna, ni dec.⌐ nada fuera de corte en relación al mismo. Véase Conclusión 14 y la declaración de Víctor Manuel Padilla. R. 679.

La independencia o autonomía de acción y de criterio del juez, su estabilidad en la judicatura, la seguridad de que su compensación no sea disminuída, el respeto y la consideración que se le debe, no han sido establecidos o reconocidos para su beneficio personal. Son factores esenciales para atraer a la magistratura hombres buenos y competentes, mantener las garantías, limitaciones y principios constitucionales y para la administración de la justicia a todos por igual. El juez debe sentirse libre del temor de ser disciplinado por faltas e irregularidades leves, involuntarias y cometidas de buena fe, y libre también de todo tipo de presión que pueda corromper su conciencia e inducirle a causar injusticias. [7]

## II

El segundo cargo por conducta inmoral se relaciona con la carta del lunes 6 de mayo, firmada por Armando Santini, transcrita en el escolio (5) de las Conclusiones de Hecho del Tribunal. Se le imputa al querellado que al redactarla, a sabiendas, hizo figurar en ella varios hechos falsos, a saber:

---

[7] Dispone el Canon XI de los Cánones de Ética Judicial:

"El Juez no solamente ha de ser imparcial, sino que su conducta ha de excluir cualquier posible inferencia de que es susceptible de actuar a base de influencias de grupos o de partidos, o de ser influído por el clamor público o por consideraciones de popularidad o notoriedad, o por otras consideraciones impropias. Ha de tener siempre presente que su único empeño debe ser impartir justicia, de acuerdo con la ley, con absoluta ecuanimidad, sin preocuparle el reconocimiento que pueda darse a su labor, ni la crítica injusta."

1. Que Santini se encontraba presente en Bayamón y en el antes mencionado incidente;

2. Que Santini había leído la transcripción del record taquigráfico de dicho incidente, y

3. Que Santini había dictado la referida carta.

Se le imputa además que en corte abierta, en el mismo día, hizo constar verbalmente el hecho falso de que dicha carta había sido escrita por el propio Armando Santini.

En la carta que dictó el querellado a petición del corresponsal Santini Berríos en torno al incidente del viernes 3 de mayo se dice en parte:

"En el incidente a que se refiere esa información no había ningún corresponsal del periódico en Bayamón que no fuera yo, e inmediatamente me comuniqué por teléfono con el redactor Barbosa Aquino y le dí todos los detalles sobre el asunto."

En ninguna parte de esa oración se afirma categóricamente que Santini presenció el incidente. Su redacción, sin embargo, se presta, al considerarse aisladamente y separada del resto del contenido de la carta, para interpretarse en el sentido de significar que Santini lo presenció. Lo que realmente se informa en esa oración es que en el día del incidente el único corresponsal que tenía en Bayamón el periódico era Santini Berríos y que él fue el que primeramente trasmitió la información a Barbosa Aquino. Se confirma ese sentido cuando en otras partes de la carta el firmante asegura que otras personas que presenciaron el incidente le decían embustero y se trasmite información por versiones dadas "según el fiscal" y "según" el informe del juez. En la misma carta se hace la referencia siguiente al record taquigráfico del incidente: "Yo he leído el record que sacó el taquígrafo seguida y le voy a copiar, para que usted vea, lo que sigue:". Considerado globalmente el contenido de la carta se nos hace imposible concluir que en la misma Santini afirme que presenció el incidente, o que el querellado, al dictarla, tuviera la intención de hacer figurar en esa carta a Santini presen-

ciando el incidente. ¿Podía tener interés el querellado en incluir en el texto de la carta esa afirmación falsa, fácilmente desmentible por más de treinta abogados, varios funcionarios judiciales, litigantes y demás personas que estuvieron presentes en el incidente? Creemos que no.

De su declaración jurada ante los fiscales, prestada el 14 de mayo de 1957, citamos:

"Señor juez, ¿usted conoce al reportero de El Imparcial, en Bayamón, Sr. Armando Santini?

"Lo conozco.

"¿El Sr. Armando Santini estaba presente en el Tribunal el día del incidente?

"Testigo: No estaba presente. Llegó después. No sé a qué hora. Y ahí es a lo que voy.

"Fiscal: Explíquenos todo alrededor de ese asunto, alrededor de Armando Santini.

"Fue a mi oficina y me dijo esto: 'Estaba fuera; al llegar aquí me han explicado que César Andréu lo desafió y me han dado detalles. ¿Qué abuso le hizo a usted César Andréu en la Corte? Yo quiero que usted me dé su versión, lo que usted sepa, para yo comunicarlo a El Imparcial.' Dije: 'Deja eso.' Eso fue en mi propia oficina. 'No quiero dar "statement" ni decir nada.' Dice: 'Mire, licenciado, es que él ahorita va a decir otra cosa por ahí.' Le dije: 'Mira, eso que te dijeron abajo es la verdad.' '¿Usted me deja llamar por su teléfono a El Imparcial?' 'Como no.' Llamó a El Imparcial por mi teléfono. Le dijo a uno que, según me dijo después, era Barbosa Aquino la versión que él tenía, que había recogido del público que estaba allí, y del fiscal Grajales y de mí. Entonces se fue. No lo ví más. Al día siguiente apareció El Imparcial diciendo lo siguiente en un gran titular; más o menos diciendo: 'El juez de Bayamón arma escándalo en la Corte.'

"¿O forma escándalo en Corte y desafía abogado?

"Algo así. Leí eso como a las ocho. Llamé a Santini a su casa; no estaba; la señora me dijo: 'Está en la fiscalía que están investigando una muerte.' Lo llamé a fiscalía y me dijo: 'Mire, juez, ahora mismo lo iba a llamar. ¿Usted se ha fijado lo sinvergüenza que es Barbosa Aquino? Ha puesto las cosas

al revés. Mañana le voy a escribir una carta a don Antonio quejándome de lo que ha hecho Barbosa Aquino porque él no estaba aquí y yo lo hice porque aún cuando no estaba, cuando llegué recogí noticias del público, la versión de la gente y de usted, y lo han puesto todo al revés.' Entonces me dijo lo siguiente: 'Mire, licenciado, le voy a pedir un favor a usted; como no sé escribir usted me hace el favor y me redacta una carta. Todo el mundo me está diciendo embustero, 'qué embustero eres Santini'; usted me redacta la carta que enseguida por la mañana, seguida que la firme se la llevo a don Antonio, porque la carta quiero escribirla a don Antonio; no es la primera vez que Barbosa Aquino me hace eso, me cambia la información.' Entonces por la mañana soy el primero en llegar, siempre soy el primero y fui temprano. Juan Amaral ha redactado la carta que me pidió Armando Santini que le hiciera; más tarde llegó Santini. Va a mi oficina y me pide la carta, se la enseño, se la dí. Dice: 'Esto es, está muy bien, pero yo le hubiera puesto cosas más fuertes porque don Antonio debe botar a Barbosa Aquino por embustero y ahora la gente cree que yo soy el embustero, pero aquí hay una cosa mala, juez, que yo quería aparecer que yo fuí el que dicté la carta. Llame a Juan Amaral para que me ponga una "post data", una "post data" a ésto como que yo la dicté al taquígrafo.' Que tuve la amabilidad de hacer llamar a Amaral y le dijo: 'Mira, Juan, pónme una "post data" diciendo que yo te dicté esa carta.' La firma y me dice: 'Me voy con Fonfrías que está ahí.' Y le dije: 'No te vayas, fírmame la copia de la carta que yo quiero quedarme con la copia de la carta', y me firmó la copia. Se la puedo mostrar a ustedes. Aquí está. Firmada por Armando Santini. La puedo dejar en poder de ustedes; que no se pierda. Entonces después que pasa eso me voy yo para la Sala y Armando Santini . . .

"Fiscal:

(Se le devuelve la carta.)

"Entonces me voy para la Corte. Estaba abochornado que un periódico dijera que yo había formado escándalo en la Corte. Estaba el Jurado y estaba llena de público la Corte. Dijo lo siguiente: estaba Armando Santini; dije lo siguiente: 'Abogados,—entre ellos el senador Fonfrías—señores, ustedes habrán leído en un periódico de Puerto Rico ayer que yo armé un es-

cándalo en esta Corte; pues para demostrarles a ustedes la veracidad de esa información voy a proceder a leer la carta, cuya copia me ha entregado el corresponsal de El Imparcial, en Bayamón, Sr. Armando Santini.' Estaba presente Santini y leí en público la carta ésta. Después que se acabó la sesión y terminó, se va Armando Santini con el licenciado Fonfrías para entregar a don Antonio la carta, a don Antonio Ayuso. . . ." (Exh. 15, Querellante, págs. 29-33.)

¿Leyó Santini "el récord que sacó el taquígrafo" según reza la carta?

Ningún testigo declaró que Santini leyó la transcripción, preparada por el taquígrafo Amaral sobre el incidente del viernes 3 de mayo, durante el almuerzo ofrecido a los abogados de Bayamón al día siguiente. Empero, varios, entre ellos el fiscal Grajales y el Lic. Archilla Laugier, manifestaron que la transcripción fue totalmente leída, en alta voz, en el curso del almuerzo, por el Lic. Tomás de Jesús Castro y que allí se habló del incidente y se comentó, estando presente Santini.—R. 343, 502, 985.—De Jesús Castro declaró que luego de leer en alta voz el récord, estando sentado a su izquierda Santini, éste lo tomó en sus manos y "estuvo ojeándolo."—R. 986.—El propio Santini declaró que cerca de él De Jesús Castro leyó el récord de "lo que había sucedido el viernes 3."—R. 685.—El Juez querellado estaba presente cuando se leía en alta voz la transcripción. R. 1120.

Como cuestión de realidad la evidencia demostró que cuando el querellado dictó la carta, Santini tenía conocimiento del contenido de aquella transcripción. Si éste la tuvo en sus manos y la hojeó, y si durante la conversación telefónica que sostuvo con el querellado en la noche del domingo 5 de mayo le pidió a éste que pusiera en la carta "lo último que aparecía en los papeles que se habían leído en la Plaza del Mercado"—R. 1122—y si luego de leer la carta—que su periódico se negó a publicar—la encontró bien y ajustada a su deseo de que su periódico corrigiera una información errónea y hasta dijo que "no estaba bastante fuerte"—

R. 1124—no podemos convenir que fuera el juez querellado el que, por su propia iniciativa y voluntad, "hizo figurar en ella" la discutible afirmación de que Santini había leído la transcripción.(⁸)

¿Hizo figurar el querellado en la carta que Santini la había dictado? Creemos que no.

Es en la posdata de la carta donde Santini le informa a su jefe que la "carta *se la escribo* en maquinilla porque el señor Amaral, taquígrafo, ha tenido la bondad de hacérmela, *según se la he dictado.*"

Por el cuidadoso análisis que hicimos de la evidencia practicada en torno a la redacción de la carta, consignamos en la Conclusión de Hecho núm. 17 precedente que luego de ser firmada por Santini éste solicitó que se le agregara a la misma la posdata de referencia. La parte del testimonio del taquígrafo Amaral, sobre este particular, tomada de las páginas 784–786 del récord es como sigue:

"P. ¿Después que usted le entregó la carta y el sobre al señor Juez Gallardo, qué usted hizo?

"R. Recuerdo que más tarde, antes de las nueve, como diez o quince o veinte minutos más tarde, me llamaron de la oficina del Juez. Entonces yo fuí a la oficina del Hon. Juez y entonces estaban allí el señor Armando Santini, la señora Ana Delia Torres y el Hon. Juez. El Hon. Juez me dijo que Santini quería ponerle una posdata a la carta y Santini me dijo que la posdata era en el sentido de que él me había dictado la carta y que yo se la había pasado en maquinilla. Entonces yo cogí, hice unos

---

(⁸) Encontramos apropiado el comentario siguiente que hacen los abogados del querellado a la página 27 de su alegato:

"El propio Santini admitió en su declaración prestada ante este Tribunal que él estaba en esa ocasión en la Plaza de Mercado, y que allí se leyó el récord, pero que él no le prestó atención. Es inaudito y es increíble el que un corresponsal de un periódico no le preste atención al contenido de un récord sobre un incidente que era la noticia del día en Bayamón, cuyo incidente había estado investigando el propio Santini el día anterior, y sobre el cual él mismo había informado al Imparcial el día anterior. Esa indiferencia, esa ausencia de curiosidad, no cabe en la imaginación de ni siquiera el más incompetente de los corresponsales."

signos taquigráficos, cogiendo el pensamiento del señor Armando Santini, cogí el original y las copias y volví a mi oficina y le puse la posdata y entonces volví y se la llevé allá.

"P. ¿Antes de usted ir a la oficina del señor Juez Gallardo, usted vio al señor Santini?

"R. No recuerdo haberlo visto.

"P. ¿No recuerda haberlo visto antes?

"R. No.

"P. Dice usted que cuando usted entró a la oficina del señor Juez Gallardo antes de las nueve de la mañana, estaban allí el Juez Gallardo, el señor Santini y la señora . . . ?

"R. Ana Delia Torres, o sea, la secretaria del Hon. Juez Gallardo.

"P. ¿Y fue el señor Santini o fue el Juez Gallardo el que le dictó a usted esa posdata?

"R. No, señor, el Hon. Juez Gallardo dijo que Santini quería que se le pusiera una posdata a la carta.

"P. Entonces le dijo el Juez Gallardo a usted, en presencia de Santini y la señora Montañez . . . R. Sí, señor. Y entonces Santini me dijo que quería que le pusiera en la carta que él me había dictado la carta y yo la había pasado.

. . . . . . . .

"P. ¿Le dictó el señor Santini personalmente la posdata que él quería que se pusiera? R. No, señor, yo hice unos signos taquigráficos cogiendo el pensamiento de Santini y le dí forma a la posdata.

"P. ¿Usted le dio forma a la posdata? R. Exacto.

"P. ¿Por qué usted no tomó taquigráficamente lo que le dictaba el señor Santini? R. No lo tomé porque en otras ocasiones yo le había pasado informaciones al señor Santini para publicarlas en El Imparcial, pero él me decía: 'Ponle esto' y yo le ponía esto.

"P. ¿Y en otras ocasiones el señor Santini le dictó a usted textualmente las informaciones? R. Si no, la preparo.

"P. ¿Usted le daba forma? R. Sí.

"P. ¿Y de la misma manera ese día usted le dio forma a la posdata? R. Exactamente.

"P. ¿De manera que esa posdata que usted dice que preparó a requerimiento del señor Santini no es una transcripción

fiel y exacta de los signos que usted tomó en aquel momento? R. No, señor, era el pensamiento de lo que él quería que se le pusiera."

Es cierto que luego de ser firmada la carta por Santini, el querellado, que la había dictado a pedimento de aquél, en corte abierta, estando presente Santini, entre otras cosas, dijo:

"Pero para satisfacción del tribunal, el propio corresponsal de Bayamón, le ha escrito una carta en el día de hoy al director del periódico . . . ."

Ni cuando prestó testimonio ante los fiscales, ni cuando declaró ante nos, negó el querellado que él hubiera dictado al taquígrafo Amaral esa carta con excepción de su posdata. En todo momento aceptó que la dictó, pero explicó que al dictarla complacía el deseo de Santini de corregir una información errónea y le daba forma y expresión escrita al pensamiento del corresponsal que hasta le había pedido que la carta contuviera lo que decía la transcripción del incidente. Obviamente Santini quería comunicarse por escrito con el director de su periódico y para ello se valió, como en otras ocasiones, de un funcionario del tribunal. Es innegable la participación que él, Santini, tuvo en la confección de esa carta incluyendo su posdata. Si él solicitó del querellado que se la dictara; si la leyó en la oficina del juez y le satisfizo su contenido, aunque lamentó que no fuera "más fuerte", y luego la firmó; si le pidió al taquígrafo que le pusiera "una posdata diciendo que yo te dicté esa carta"; si oyó tranquilamente al juez leer la carta y la llevó al director de su periódico para su publicación, no fue estrictamente inexacto el querellado al informar en corte abierta que Santini había escrito la carta. Es claro que el querellado debió haber expresado con mayor propiedad el origen y circunstancias de la carta.

Independientemente de la caracterización que se le haya dado a estos procedimientos, siempre se ha sostenido que los trámites fijados constitucional o estatutariamente deben ser

cumplidos estrictamente; que en los mismos la parte querellada goza de las presunciones generales de ley; que sobre la parte querellante recae el peso de la prueba y que ésta debe ser suficiente, clara y convincente. *Pérez* v. *Meraux*, 201 La. 498, 9 So.2d 662; *McMillen et al* v. *Diehl*, 128 Ohio St. 212, 190 N.E. 567, 568; *State ex rel. Brickell* v. *Hasty*, 184 Ala. 121, 50 L.R.A. N.S. 553, 560; *Kane* v. *Rudich*, 10 N.Y.S. 2d 929, 256 App. Div. 586; *Stanley* v. *Jones*, 9 So. 2d 678, 201 La. 549; 30A Am. Jur., *Judges*, secs. 24–25; 48 C.J.S. *Judges*, sec. 27.

Si bien la conducta del juez querellado observada durante el incidente del 3 de mayo de 1957 no merece nuestra sanción, ni aprobamos la forma en que se dirigió a las personas presentes en corte en la mañana del lunes 6 de mayo, sin embargo, la prueba del querellante no nos ha convencido de que dicho juez querellado sea culpable de conducta inmoral. Por tales razones fue mi criterio que debía declararse sin lugar y en todas sus partes la querella y exonerado el juez querellado Fernando Gallardo Díaz de los cargos que en la misma se le formularon.

---

Opinión del JUEZ ASOCIADO SR. SANTANA BECERRA, en la cual concurre el JUEZ ASOCIADO SR. HERNÁNDEZ MATOS.

Concurro en las conclusiones expuestas en su opinión por el Juez Asociado Sr. Hernández Matos. Creo que los hechos probados no justifican ni sostienen una convicción de *conducta inmoral* en el significado, alcance y contenido que a dicho concepto doy a los fines de la destitución de un magistrado del Tribunal de Primera Instancia, que es, a mi juicio, el *único fin* que propiamente una convicción de conducta inmoral puede y debe tener bajo la sec. 24 de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico. Deseo, no obstante mi completo acuerdo con el Juez Sr. Hernández Matos, exponer estas otras consideraciones, muy per-

sonales quizás, que me llevan a reafirmar sus conclusiones y mi concurrencia.

A tenor de los hechos probados en este caso, surgen a la palestra dos valores sociales de suma importancia que trascienden los lindes de éste, o de cualquier otro caso en particular. En uno, la magistratura está envuelta en cuanto a la integridad de la administración de justicia, en el otro, en cuanto a la integridad política de la función judicial. Entre ambos valores hay un fino equilibrio que precisa mantenerse bien vigilado, no sea que uno de ellos haya de lastimar el otro.

El ejercicio de aquella parte de la soberanía única e indivisible del pueblo de Puerto Rico que toca a la función judicial, quedó delegado en el Tribunal Supremo y en aquellos otros tribunales creados por ley. [1] Por ley se creó el Tribunal de Primera Instancia y por consiguiente, sus jueces ejercen esa parte de la soberanía del pueblo que se refiere a la función judicial en plena igualdad de poder político con el Tribunal Supremo, ya que no debe entenderse que la superior jerarquía del Tribunal Supremo, cosa común en la arquitectura de sistemas judiciales como el que nos rige, ni su poder, en otras áreas, de superintendencia o de vigilancia sobre los tribunales de inferior jerarquía, han de representar una limitación de la función política de soberanía que encarnan y ejercen los magistrados de Primera Instancia; o que tal función política de soberanía les llega a través de canales jerárquicos, o por delegación del Tribunal Supremo.

Por razón de que fue el pueblo quien delegó en los magistrados el ejercicio de esa función de su soberanía, ha sido de vital interés y de preocupación para el pueblo mismo, en protección de la facultad delegada, la incumbencia de los jueces que han de ejercer el mandato público otorgado, la permanencia y disfrute de dicha incumbencia, así como la ce-

---

[1] Constitución, Art. I Sec. 1, Sec. 2; Art. V Sec. 1.

sación del mandato por razones que no sean la expiración natural del mismo. (²) En lo que a esto último respecta, fijó como causas para la destitución de un juez del Tribunal Supremo, esto es, lo que el pueblo consideró que debían ser motivos para retirarle a tal juez el ejercicio de la función judicial de soberanía conferido a él, la traición, el soborno, otros delitos graves, y aquellos delitos menos grave que impliquen depravación. En cuanto a la destitución de los jueces de los demás tribunales, el pueblo delegó expresamente en el Poder Legislativo para que estableciera sus causas, (³) y la sec. 24 de la Ley de la Judicatura—Ley 11 de 24 de julio de 1952—dispuso que a los jueces del Tribunal de Primera Instancia ha de imputárseles conducta inmoral o negligencia en sus deberes judiciales, y probados los hechos, el Tribunal Supremo podrá censurarlos, suspenderlos o destituirlos permanentemente de sus cargos.

El término "conducta inmoral" en sí es un término general y abarcador. Las definiciones que de él se tienen ya sean de orden puramente legal o en el orden social comprenden otras tantas generalizaciones. Sí, existe un concepto arraigado, muchas veces más bien intuído o captado que el definido, de lo que es una conducta inmoral, producto ese concepto de los valores éticos prevalecientes en una sociedad o en una civilización. Pero a veces tal sentido general no ayuda a resolver problemas concretos.

De ahí que, en ausencia de una norma legislativa más precisa en cuanto a qué actos, o qué clase de actuaciones de los magistrados del Tribunal de Primera Instancia han de justificar el retiro a ellos de la función política de soberanía

---

(²) Constitución. Art. V Sec. 8,—mínimo constitucional del período de incumbencia—; Sec. 10,—retiro de los jueces por ley especial —; Sec. 12, —protección de la incumbencia contra actividades políticas—; Sec. 13,— protección contra la terminación de la incumbencia por medios indirectos—, Art. IX Sec. 3,—protección de la incumbencia sobre el límite de edad constitucional—.

(³) Constitución. Art. V Sec. 11; Art. III Sec. 21.

con que han sido investidos, nada más apropiado, me parece, que ante el problema de la destitución de un juez, y al darle significado y contenido al impreciso término "conducta inmoral", el Tribunal Supremo se oriente en el pensamiento del pueblo y fije aquella conducta, o una similar, a la que el pueblo creyó propio fijar para el retiro del ejercicio de igual función de la soberanía conferido a un juez del Tribunal Supremo. Si se quiere, podría tomarse también como orientación aquella conducta, o una similar, que en el pasado estableció el mismo Poder Legislativo como causa para la destitución de los magistrados del Tribunal Superior, entonces magistrados de Distrito.[4] En cualquiera de ellas estarían presentes elementos de depravación o de deformación moral.

Y me parece apropiado que así sea porque, después de todo, aún cuando se precisa de jerarquías funcionales dentro de la magistratura, en la pureza de su símbolo, y en el concepto público de estimación y de respeto que debe merecer, no han de caber en la magistratura jerarquías éticas. No hay lugar para escalas distintas de valores morales, ya que en cualquier plano jerárquico en que un magistrado por sus actos se haga indigno del honor y de la confianza puestos en él ofende por igual a la sociedad y defrauda por igual valores públicos de alta significación de los cuales es depositario.

Las anteriores consideraciones sobre la norma interpretativa que a mi juicio debe seguirse bajo la sec. 24,—inspiradas esencial y fundamentalmente en el hecho de la inamovilidad y seguridad de los jueces en sus cargos que es postulado básico, no sólo de la independencia de la función judicial como organismo de gobierno frente a otros organismos

---

[4] La Ley 58 de 29 de abril de 1930 dispuso la destitución de los jueces de Distrito [Superiores] por las siguientes causas: prevaricación, soborno, conducta inmoral, cualquier delito que implique depravación moral, negligencia inexcusable o ineptitud manifiesta para el desempeño de sus funciones. La Ley Orgánica de la Judicatura,—Ley 432 de 15 de mayo de 1950,—dispuso idénticas causas de destitución. Ninguna de esas leyes proveyó para otro castigo que no fuera destitución.

de gobierno sino que también, de la independencia judicial en la libertad del espíritu y de la conciencia del juez,—explican porqué he creído que los hechos que se probaron al juez querellado Sr. Fernando Gallardo Díaz no constituyen conducta inmoral, por ausencia en ellos de depravación. Son hechos que el Juez Asociado Sr. Hernández Matos ha caracterizado en forma que yo no necesito repetir, pero que surgieron de súbito al calor de un incidente no prepensado por el juez; hechos carentes de malicia en tanto la malicia es elemento de un fin o propósito concebido o realizado con intención torcida, y en tanto no hay malicia en la súbita reacción. Los jueces, a menos que fueran creados de barro aparte, no son inmunes a la flaqueza y a la debilidad de la mente humana, que a veces lleva al arrebato y deja libre la pasión. (5)

En cuanto a lo ocurrido tres días después, el lunes 6 de mayo de 1957 motivo del segundo cargo, de la prueba queda el convencimiento pleno que el juez no coaccionó ni intimidó, ni indujo tampoco al corresponsal del periódico para que rectificara la información publicada, ni incurrió en falsedad, o en acto alguno malicioso o avieso. Si algo desacertado hizo, no propio dada su condición de ser juez pero explicable a la luz de las circunstancias del momento, fue prestar su cooperación a dicho corresponsal y llevar luego la rectificación a las actas del Tribunal acompañada de crudos comentarios.

Son hechos, repito, que chocan con normas prevalecientes de un buen decir y del buen hacer de un magistrado en sala de justicia, o fuera de ella, normas que luego se han puesto por escrito en un código de ética judicial promulgado posteriormente a este caso, pero hechos que al no acusar malicia,

---

(5) Quiera Dios,—recordando un discurso que pronunciara el Presidente del Senado Hon. Samuel R. Quiñones en la apertura de la pasada Conferencia Judicial—que la técnica moderna no logre jamás producir artefactos para impartir justicia, muy perfectos, tal vez, pero carentes del sentimiento humano con todas sus virtudes y flaquezas.

depravación o deformación mental sería un tanto arriesgado que se consideraran como conducta inmoral para destituir a un magistrado, por las razones de orden público y de orden constitucional que he señalado. Me he referido únicamente a la destitución, y no ha sido por inadvertencia.

Entender que sea conducta inmoral bajo la sec. 24 cualquier conducta de un magistrado que meramente no responda a la mejor tradición judicial o a las normas conocidas como cánones de ética, podría facilmente alterar el balance de los dos valores públicos al cual hice referencia al principio, y quedar así destruído el equilibrio deseable entre ellos. Contra esto podría argumentarse que la convicción de conducta inmoral bajo esta sección no implica necesariamente la destitución del magistrado en vista de que podrá imponérsele una suspensión temporal y hasta una censura, y que por lo tanto basta cualquier conducta indebida. No comparto el argumento por las siguientes consideraciones, hijas de un profundo convencimiento:

*Primero*, para mí son irreconciliables la convicción de un magistrado por conducta inmoral y el hecho de que continúe impartiendo justicia después de un período de suspensión como castigo, o de una censura. El término "conducta inmoral", sea lo que fuere bajo la sec. 24, tiene de ordinario en el concepto público una connotación de vileza, de vicio o maldad; cuando menos, de impureza. El desdoro que recibe la judicatura de un país, y los valores públicos en general, con la convicción de un magistrado por conducta inmoral no se agrava, ni se aminora, por la mayor o menor cuantía de castigo impuesto al juez delincuente. Para ello basta el hecho de la convicción en sí. Hay valores, como la castidad, que una vez perdidos no son restituíbles, y uno de ellos es el atributo de pureza de alma que debe rodear a aquéllos a quienes toca el privilegio de impartir justicia entre sus semejantes, que como justicia al fin, debe venir de manos y de mentes que no hayan perdido, por una sola vez, dicho atributo.

Así creo, como expresé al comenzar esta opinión, que el *único fin* que una convicción de conducta inmoral bajo la sec. 24 propiamente puede y debe tener, es la destitución del magistrado convicto. De haber tenido el convencimiento en este caso, o de tenerlo en cualquier otro caso, que el juez ha incurrido en conducta inmoral, una vez convicto votaría por la destitución plena porque estimo que sufriría toda la magistratura con devolverlo, después de una suspensión temporal, al seno de la misma con su toga así maculada.

El Informe del Comité que redactó la Ley de la Judicatura sostiene, a mi juicio, el enfoque que doy a la sec. 24. Expresó dicho Informe que las causas para la destitución o para otras penalidades a ser impuestas a un juez son conducta inmoral y negligencia en sus deberes judiciales. Dice que la conducta inmoral incluye cualquier indicio de inmoralidad o de prevaricación que *incapaciten* al juez para actuar como tal y merecer la confianza pública; y que la negligencia en los deberes judiciales no consiste sólo de dejar de hacer la labor *sino que también el dejar de seguir las altas normas de ética judicial establecidas por códigos profesionales*, los cuales *eran de esperarse serían adoptados expresamente para las cortes* del Estado Libre Asociado de Puerto Rico. Más claro, a mi juicio, no puede aparecer el desglose. La conducta inmoral: cualquier indicio de inmoralidad o de prevaricación, que *incapaciten* al juez para merecer la confianza pública. De ahí no se capta la idea de que sea una incapacidad temporal, sobre todo cuando la incapacidad es la de *actuar* como juez y para *merecer* la *confianza pública*. La negligencia en los deberes judiciales: no hacer la labor, pero también, el no seguir las *altas* normas de *ética judicial*, refiriéndose, indudablemente, a códigos de ética judicial en vigor en otras localidades y en ese entonces aún no adoptados en Puerto Rico. De donde se desprende, aunque así no aparezca tan claramente expuesto en la redacción de la sec. 24, que al referirse ésta a suspensiones o censuras no había en mente

aquellos casos de conducta inmoral que son los que, en expresión del Informe, producen la *incapacidad* del juez como *tal;* y de donde se desprende, que conducta indebida a la luz de cánones de ética judicial, que es lo único demostrado en este caso, daría lugar a lo sumo a cargos de negligencia.

*Segundo,* por aquello de que bajo una imputación de "conducta inmoral" sería permisible imponer castigo de suspensión temporal o censura de ser interpretada la sección 24 en forma distinta a como yo sugiero, no creo en la virtud de descolorar el término para incluir cualquier comportamiento judicial meramente desacertado, intemperante o improcedente que pueda resultar bajo tal imputación. Ello podría desembocar eventualmente en el hecho de que real y efectivamente los jueces de Primera Instancia vengan a quedar colocados, en lo que a su incumbencia y el desempeño del cargo respecta, bajo un poder disciplinario *inherente* al Tribunal Supremo que, por razones obvias y por la gran diferencia en el origen de la función, debe quedar limitado a los abogados postulantes. La eventualidad cobra mayor cercanía si se considera que es al propio Tribunal Supremo a quien corresponde, ante hechos presentados, determinar si han de seguirse o no ulteriores procedimientos; y si en una mayoría del Tribunal llegare a prevalecer el criterio de que cualquier comportamiento indebido o impropio de un juez es suficiente conducta inmoral a los efectos de la sec. 24, incuestionablemente los ulteriores procedimientos con frecuencia serían seguidos.

Por varias consideraciones no creo que una situación así es saludable. A la larga, tendría el efecto de debilitar el prestigio y la alta estimación que los jueces deben merecer de la comunidad, estimación más necesaria cuanto más directamente en contacto con ella, y que en nuestro medio tradicional y justamente siempre han merecido. No obstante la ausencia de una carrera judicial con la consiguiente inamovilidad; el que los nombramientos para la magistratura de

inferior jerarquía al Tribunal Supremo no han tenido el carácter de vitalicios, y que la retribución de los jueces no ha sido la más feliz, nuestra magistratura ha dejado en su haber una estela de limpieza libre del cohecho, de prevaricación y de venalidad. Comenta Don José Castán Tobeñas que si el prestigio de la justicia inglesa es indudable, y que si el nivel de la Gran Bretaña es muy alto por lo que se refiere a la independencia e integridad de los jueces débese ello, más que a razones constitucionales o de organización judicial, a un conjunto de circunstancias felices, históricas y sociales; y que es sobre todo el *medio* y el *ambiente social* el que ha venido allí asegurando la independencia y la reputación del cuerpo judicial.(⁶) Y acaso no menos procedentes son estas otras manifestaciones del Juez Frankfurter:

"La idea de un gobierno de leyes dominó en el pensamiento de aquéllos que fundaron esta Nación y diseñaron su Constitución, aunque ellos sabían tan bien como los que restaban importancia a la idea, que las leyes han de ser hechas, interpretadas y ejecutadas por hombres. A tal fin, ellos separaron un cuerpo de hombres, que habrían de ser los depositarios de la ley, quienes por su adiestramiento disciplinado y su carácter y por el apartamiento de las comunes tentaciones del interés personal, razonablemente puede esperarse que sean 'tan libres, imparciales e independientes como la mar de la humanidad admitirá'. Tan fuertemente inclinados estaban los forjadores de la Constitución a asegurar un regimen de ley que ellos dotaron el cargo judicial de extraordinarias salvaguardias y prestigio."(⁷)

---

(⁶) *Poder Judicial e Independencia Judicial,* discurso leído por Don José Castán en la apertura de los Tribunales, 1951. Castán cita de paso al procesalista Manuel de la Plaza quien señala, entre las razones para el buen éxito del sistema judicial inglés—"el elevado concepto que en el *ambiente social* se tiene de la misión del Juez, que frena la eventualidad, remotísima, por otra parte, de una injerencia en sus funciones; la supresión del ascenso, facilitada por la pingüe retribución . . . las dificultades con que tropieza la *remoción* de los jueces . . . Todo ello demuestra que las excelencias que se predican de la justicia británica no derivan del sistema de designación, francamente recusable por muchos motivos, *sino de la concepción nacional de la justicia como función.*" (Énfasis adicionado.)

(⁷) *United States* v. *Mine Workers,* 330 U.S. 258, 308.

Mientras más elevado y digno sea el concepto que a la sociedad le merezcan sus jueces, mayor su escudo, y menos incursiones se atentarán contra la integridad de su ministerio. No creo, sinceramente, que un sistema en que los magistrados sean, o estén expuestos a ser, objeto de frecuentes castigos disciplinarios conduzca a mantenerlos en el concepto social de una alta estimación y prestigio tan necesario, todavía más que la organización perfecta según observa Castán del sistema inglés, a la adecuada función de la justicia.

Además, hay por lo menos otra consideración que me hace reflexionar hondamente en torno a lo antes expresado. No sé si realmente estuvo en el pensamiento del pueblo el que a los magistrados se les hiciera objeto de suspensiones periódicas u otros castigos que no fuera la destitución en los casos apropiados. No estoy ahora pensando en un problema de *poder* de la Asamblea Legislativa para autorizar castigos aparte de la destitución de los jueces. Tengo en mente un problema de deseabilidad, porque muy bien el pueblo pudo no haberlo considerado deseable, y tal vez no le habrían faltado razones para ello. (⁸) Cuando se reunió la Convención Constituyente la tradición legislativa era la de Ley 58 de 1930 para los jueces Superiores, repetida en la Ley Orgánica de la Judicatura de 1950 (ante escolio 4). Y para los entonces jueces municipales, hoy de Distrito, no había disposición de ley, pero sabido es que no podían ser destituídos sino por justa causa, y tampoco existía para ellos la suspensión temporal del cargo como castigo. Un sistema que funcionó así por medio siglo o más debía tener una razón de ser. Porque, aparte del efecto moral en la comunidad a que me he referido antes, de jueces castigados o públicamente censurados en cuanto ello se refleja en su delicada función de impartir justicia y en cuanto ellos simbolizan la autoridad judicial, en un balance de consecuencias puede que la suspensión de un magistrado del cargo, presumo que sin poder renunciar al

---

(⁸) Constitución—Art. V Sec. 11. Menciona sólo la destitución.

mismo mientras dura el castigo, bien que podría conducirlo en la lucha por su subsistencia a realizar actos, no precisamente denigrantes, pero que de alguna manera menoscabaren su reputación y lesionaren la integridad de su cargo tanto como o más que aquellos por los cuales se le castigó.

No quiero decir que la magistratura de Primera Instancia goce de licencia para descender a cualquier nivel de prestigio. Por el contrario, un sentido perenne de superación y de ensanchamiento de su acervo moral e intelectual debe inspirar en ella como en toda magistratura, pero preferible que así sea por elevación del espíritu y por conciencia plena de la alta prerrogativa que ella ejerce,—la justicia—que en palabras de William McAdoo, es la más reluciente joya en la corona de la democracia; (⁹) y no porque tema ella estar sujeta a castigos y disciplinas que antes de exaltarla, a la larga la desmejorarán en el concepto público. No están los jueces carentes de responsabilidad. Nada tan verdad ahora como lo era ochenta y siete años atrás, lo que el Ministro de Gracia y Justicia Don Eugenio Montero Ríos dijera a los jueces españoles en ocasión de la apertura de los Tribunales el 16 de septiembre de 1872, al anunciarles su inamovilidad consagrada en la Ley Orgánica del Poder Judicial de 15 de septiembre de 1870 autorizada por las Cortes Constituyentes:

"[S]ois, pues, un poder en la Constitución del Estado. Sois también una gran fuerza en la vida social. Como poder público, sois la garantía de todos los derechos. Como fuerza social, dais eficacia a todos los deberes. Como poder, corre a vuestro cargo la integridad de la Constitución y de las leyes. Como fuerza social, respondeis ante la conciencia pública del estado moral de la Nación. . . . Pero la justicia necesita ser elevada a la categoría de los poderes públicos por medio de la organización vigorosa de las instituciones que hayan de administrarla, *y por*

---

(⁹) Senador William G. McAdoo, en el proceso de residenciamiento del juez federal Halsted L. Ritter, citado por Yankwich en *Impeachment of Civil Officers*, etc., 26 Geo. L. J. pág. 849, (859). Es interesante la recopilación de residenciamientos de jueces que hace el autor y las causas imputadas, empezando por el del Lord Canciller Sir Francis Bacon en 1620.

*las prerrogativas y garantías otorgadas para el digno desempeño de sus funciones, a los Magistrados que las representan.* . . . Hoy, pues, con más razón que en 15 de Septiembre de 1870 puedo deciros: sois inamovibles. Pero entendedlo bien: *sois inamovibles en vuestro cargo porque sois responsables de vuestros actos.* . . . La ley os ha otorgado todo cuanto teniais derecho a exigir. De vosotros depende conservarlo. . . . La inamovilidad sin las condiciones que la limitan sería la impunidad del Magistrado prevaricador; y nuestros tiempos, bien lo sabeis, no son por regla general favorables a la inviolabilidad de los poderes humanos ni a la impunidad de los que delinquen en su nombre. . . . Si quereis, pues, conservar la inamovilidad, *velad vosotros mismos incesantemente por el cumplimiento de la responsabilidad judicial,* anticipandoos al ciudadano, que podrá ejercer la acción popular que la Constitución le reconoce. . . . No confundais nunca la santidad de la justicia con la inviolabilidad de vuestros actos, porque se corre grave riesgo en querer resguardar las faltas del hombre detrás de la santidad de la institución". (Énfasis adicionado.)

Elocuente declaración de principios para una magistratura. Y sobre todo el hecho, que jamás debe pasar desapercibido para los jueces, de la sanción siempre presente de la comunidad, a veces más crítica y severa que cualquier disciplina jerárquica, la cual cobra expresión en la prensa, en la opinión pública en general y en los demás organismos políticos del Estado.

Por accidente no ha habido una decisión del Tribunal Supremo en este caso. Porque creo, sin embargo, que los anteriores planteamientos producto de una profunda convicción trascienden los lindes del que nos ocupa y son comunes a todos los demás de igual naturaleza que habrán de producirse, y por el problema de derecho público que envuelven, no deseo cerrar esta opinión sin expresar mi particular sentir sobre la deseabilidad de una revisión de la sec. 24 de la Ley de la Judicatura vigente, a fin de que el Poder Legislativo, como la más directa representación del pueblo que invistió a los jueces con el poder judicial, dictamine precisamente los actos, o tipo de actos de un magistrado de

Primera Instancia que han de dar lugar a que se le prive de su investidura; así como aquella otra conducta, si se tiene el criterio que ello es deseable, que debe producir la suspensión del juez u otro castigo, con aquellas medidas que se consideraren apropiadas para no crear en torno al magistrado una condición que a la larga resulte más bien lesiva a la impartición de la justicia que a él.

De ese modo, más que la función *normativa* que hasta cierto punto resulta obligada tal como hoy reza la sec. 24, correspondería al Tribunal Supremo tanto en la etapa inicial como en la ulterior la más apropiada del juzgador de los hechos y la de la imposición del castigo, a la luz de normas públicas predeterminadas por ley.[10]

Por razón de todo lo expresado, por entender que bajo una imputación de conducta inmoral que es la hecha al juez querellado sólo procede una convicción de conducta inmoral sin que exista facultad inherente en el Tribunal Supremo para disciplinarlo a menos que se le declare convicto de tal tipo de conducta, en cuyo caso, procedería a mi juicio nada más que una destitución; y por ser mi criterio que los hechos probados no demostraron conducta inmoral en el significado y contenido que para mí tiene dicho término en la sec. 24 de la Ley de la Judicatura que nos rige, voté por la exoneración del Juez Sr. Fernando Gallardo Díaz.

---

[10] Se dice que Aragón fue el primer pueblo de Europa que reclamó ya en 1442 la estabilidad de sus jueces, siguiéndole Inglaterra en 1688. En la Constitución de Bayona de 1808 España dispuso cierta forma de inamovilidad, pero fue a partir de la Constitución de Cádiz de 1812, y de ahí en adelante en todas las constituciones que siguieron, que se consignó sólo en cuanto a los jueces la inamovilidad del cargo, consistente en la prohibición de ser los magistrados depuestos, suspendidos, trasladados o jubilados sino por las causas y actos estatuídos por ley. Decía el preámbulo de la Constitución de Cádiz de 1812 que "[C]omo la integridad de los jueces es el requisito más esencial para el buen desempeño de su cargo, es preciso asegurar en ellos esta virtud por cuantos medios sean imaginables. Su ánimo debe estar a cubierto de las impresiones que pueda producir hasta el *remoto recelo* de una separación violenta". La Ley Orgánica de la judicatura española—Ley de 15 de septiembre de:

1870—según ha sido hasta el presente modificada o complementada, expone de manera precisa y detallada, al igual que el Código Penal español en los artículos referentes a la prevaricación, los actos que dan lugar a la destitución de los magistrados, los que sirven para diversos períodos de suspensión, los que dan lugar a traslados, y otras correcciones, así como lo referente a la retribución, o pérdida de la misma, durante un período de suspensión. Esta norma de minuciosidad en la ley o en la constitución, por lo menos en lo que a la destitución se refiiere, existe en muchas otras jurisdicciones. Medina y Marañón, *Leyes Penales de España*, 10ª ed. (1947) ; *Códigos, Leyes y Tratados Vigentes* (1885) ; *Enciclopedia Jurídica Española*, Tomo 18, pág. 903; Tomo 20, pág. 775; Apéndice, 1946, pág. 916; Alcubilla, *Diccionario de Administración*, Tomo 6, pág. 163; *Revista de Legislación y Jurisprudencia*, Tomo 41, págs. 112 et seq.; Tomo 65, pág. 119.